705 So.2d 149 (1997)
LIVINGSTON DOWNS RACING ASSOCIATION, INC.
v.
STATE of Louisiana, et al.
No. 96-CA-2890.
Supreme Court of Louisiana.
December 2, 1997.
Dissenting Opinion January 7, 1998.
Rehearing Denied January 9, 1998.
*150 James M. Ross, Richard P. Ieyoub, Atty. Gen., J. Carter Wilkinson, Charles S. McCowan, Jr., James P. Dore, Troy J. Charpentier, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Kirk A. Bergeron, Salvador Anzelmo, George M. Cotton, Hoffman, Sutterfield, Ensenat & Bankston, Kim R. Chatelain, Baton Rouge, for Applicant.
Victor A. Sachse, III, Darlene S. Ransome, Claude F. Reynaud, Jr., Jude C. Bursavich, C. James Gelpi, David S. McFadden, New Orleans, for Respondent.
Henry C. Perret, Jr., Marilyn C. Castle, Lafayette, for Old Evangeline Downs, Amicus Curiae.
Dissenting Opinion of Justice Lemmon January 7, 1998.
JOHNSON, Justice.
This matter comes before the court as a direct appeal from a trial judge's determination that a portion of LSA-R.S. 4:211(5) is unconstitutional.[1] At issue is whether portions of the Louisiana offtrack wagering legislation violate both the state and federal constitutions. Specifically, we must determine whether language contained within LSA-R.S. 4:211(5), infringes upon plaintiff's right to equal protection. Additionally, we must decide whether the offtrack wagering legislation is a local or special law and whether the statute is being selectively enforced.

FACTS AND PROCEDURAL HISTORY
The pertinent facts of this case are not in dispute. During the 1987 legislative session, statutes were enacted to allow offtrack wagering in Louisiana at pari-mutuel facilities. At that time there were five primary racing facilities conducting horse races, namely, Delta Downs, Evangeline Downs, the Fairgrounds Corporation, Jefferson Downs and Louisiana Downs. These five primary racing associations owned race tracks. Two other racing associations were operating in Louisiana but were not primary licensees. Red River Downs was operating pursuant to a lease at Louisiana Downs, while Lakefront Turf Club operated at Jefferson Downs. The five associations met the definition of "primary licensee" and were eligible to conduct offtrack wagering. LSA-R.S. 4:211(7) states that a primary licensee is a licensed association conducting the majority of race days at a pari-mutuel facility. A pari-mutuel facility is defined within LSA-R.S. 4:211(5) as any pari-mutuel race track conducting horse races during or prior to the 1986-87 racing season.
In 1992, Jefferson Downs closed. Thereafter, Livingston Downs Racing Association (hereafter referred to Livingston Downs) applied to the Louisiana State Racing Commission (hereafter referred to as Racing Commission) for a permit to conduct live horse racing in Livingston Parish. It intended to apply for the racing dates left open due to the closure of Jefferson Downs. Additionally, Livingston Downs applied for a license to conduct and operate an offtrack wagering facility.
The Racing Commission met on May 27, 1993 in Boissier City. At this meeting, the Racing Commission heard testimony from representatives for Livingston Downs and voted on its request for application of racing dates with 55 days of thoroughbred racing, *151 50 days of quarter horse racing, and a single on-site wagering facility. The testimony shows that Livingston Downs amended its application to delete any reference to an offtrack wagering license. In fact, the Chairman, Oscar Tolmas, opined that any offtrack wagering application made by Livingston Downs could not be placed on the agenda because the Racing Commission was forbidden by statute from considering it.[2] All members present, with the exception of Commissioner Darlene Ranson[3] who abstained, voted in favor of Livingston Downs' application. Despite having its license approved to conduct live horse racing, the record shows that Livingston Downs has never offered any horse races nor have they opened a racing facility.
On October 19, 1993, Livingston Downs filed suit in the 19th Judicial District Court (No. 399, 563) seeking both declaratory and injunctive relief. The case was allotted to Division "M". In this suit, petitioner requested that the court declare LSA-R.S. 4:211(5) & (7), and 4:214(A)(1) unconstitutional because Livingston Downs was denied equal protection. The Fairgrounds Corporation intervened on October 22, 1993.
On November 8, 1993, the trial court denied Livingston Downs' request for injunctive relief. The Fairgrounds then moved for summary judgment requesting a dismissal of Livingston Downs' claims. On April 18, 1994, summary judgment was rendered in favor of the Fairgrounds and plaintiff appealed to the First Circuit Court of Appeal. In its decision of April 7, 1995, the appellate court reversed the trial court's findings on the application for injunctive relief and the summary judgment motion. Finding that the offtrack wagering law "appeared" to benefit a very exclusive class, the appellate court remanded the case and ordered that the trial court take additional evidence to show who are the actual beneficiaries of offtrack wagering. Livingston Downs Racing Association, Inc. v. State of Louisiana Through Edwin W. Edwards, Individually and as Governor, et al., 94-1514 (La.App. 1 Cir. 47/95), 653 So.2d 1311.
The procedural history of this convoluted litigation shows that while the appeal was pending, Livingston Downs filed another suit in the 19th Judicial District Court (No. 413,022) against the State and other defendants. This action was allotted to Division "A". After amending its petition, Livingston Downs once again sought injunctive relief and a declaratory judgment aimed at the payouts of video poker machines. Under La. R.S. 27:304, a video poker device cannot render awards or credits in excess of $500.00. However, this statute has an exception which allows the credits at a maximum of $1,000.00 where live racing is conducted or where pari-mutuel wagering is offered. The cases were eventually consolidated and were sent to Judge Foster Sanders of Division "A".
A trial de novo was conducted from May 28 through 31, and June 3, 4, 6 and 7, 1996. The trial court determined that because the statute at issue, LSA-R.S. 4:211(5), contained restrictive language, it was a local and special law in violation of Art. III, Sec. 12 of the Louisiana Constitution. Specifically, the trial judge opined that the phrase "during the 1986-87 racing season and prior to the effective date of this part" rendered the statute unconstitutional. The restriction denies any association which obtained its license subsequent to 1988, the right to own and operate a facility for offtrack betting. The trial court further found that the actual beneficiaries of the offtrack wagering laws are those persons who operated race tracks when the legislation was passed. The offtrack wagering legislation therefore benefited a special class as opposed to the entire state without any compelling reasons. According to the lower court, the Legislature granted a new right to a select group of track owners, but did not make the same right available to the general public without a rational basis. The trial court concluded LSA-R.S. 4:211(5) denied plaintiff equal protection as guaranteed by both the state and federal constitutions. The defendants were then assessed with costs and attorney's fees in the amount of $37,500.00. *152 The amount was later increased to $57,500.00.

DISCUSSION
Our Legislature enacted specific statutes governing activities involving offtrack wagering. Added by Acts 1987, No. 203 § 1, which became effective on June 30, 1987, Louisiana authorized the establishment of offtrack wagering facilities.[4] The statute at issue is found in the Revised Statutes under Title 4 "Amusement and Sports" in Chapter 4 which deals with "Racing". La. R.S. 4:211(5) provides:
(5) "Pari-mutuel facility" means any pari-mutuel race track conducting race meetings during the 1986-87 racing season and licensed prior to the effective date of this Part.
Our jurisprudence mandates that all statutory enactments are presumed constitutional and every presumption of law and fact must be indulged in favor of legality. Moore v. RLCC Technologies, Inc., 95-2621 (La.2/28/96), 668 So.2d 1135; Polk v. Edwards, 626 So.2d 1128 (La.1993); See also, State ex. rel. Kemp v. City of Baton Rouge, 215 La. 315, 40 So.2d 477 (1949). To determine the Legislature's intent for enacting laws in the area of horse racing, we look to LSA-R.S. 4:141. This statute, entitled Legislative intent and policy, provides in pertinent part:
A. It is the policy of the state of Louisiana in furtherance of its responsibility to provide revenues for the operation of state government for its people, to acknowledge and declare that the providing of funds and financial assistance to licensed horse racing tracks in the state of Louisiana constitutes an authorized public function and purpose of the state of Louisiana, to encourage forceful and honest statewide control of horse racing for the public health, safety, and welfare by safeguarding the people of this state against corruption, incompetent, dishonest and unprincipled horse racing practices;
(1) To institute and maintain a program and permit development of the business of horse racing with pari-mutuel wagering thereon on a high plane.
(2) To institute and maintain a program to encourage and permit development of the breeding and ownership of race horses in the state.
(3) To institute and maintain a regulatory program for the business of racing horses, which program assures the protection of public health, safety and welfare, vesting with the commission forceful statewide control of horse racing with full powers to prescribe rules and regulations and conditions under which all horse racing is conducted with wagering upon the result thereof with the state.
(4) To institute and maintain a program to provide financial assistance that will encourage and permit the development of the business of horse racing by licensed horse racing tracks in the state of Louisiana.
(5) To institute and maintain a program for the regulation, ownership, possession, licensing, keeping, and inoculation of animals on premises under its control and supervision not inconsistent with the rules and regulations of the state livestock and sanitary board.
The statute's purpose is outlined in LSA-R.S. 4:142. Essentially, it was enacted to permit the maximum development of the horse racing industry with "pari-mutuel" wagering, breeding and ownership of race horses. It also serves as an effective regulation as well as orderly conduct of the horse racing industry, and establishes procedures for licensing.

Does LSA-R.S. 4:211(5) violate Plaintiff's right of equal protection?
In its reasons for judgment, the trial court determined that the restrictive language contained in LSA-R.S. 4:211(5) was "violative of *153 equal protection in derogation of Article I, Section 3 ..." Article I, § 3 entitled "Right to Individual Dignity" provides:
No person shall be denied the equal protection of the laws. No laws shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibited, except in the latter case as punishment for crime.
The State argues that LSA-R.S. 4:211 does not create "a class within a class". According to the State, the 1986-87 limitation was valid when passed because evidence in this case clearly shows that offtrack wagering suitably furthered the State's interest in promoting and saving the racing industry which was experiencing a period of declining revenues. In order to be constitutionally valid, all that is required is that offtrack wagering statutes be rationally related to a legitimate state interest or suitably further any appropriate state interest.
As intervenor, the Fair Grounds Corporation argues that the relief granted by the trial court in striking a definition crucial to a limited authorization of offtrack wagering laws resulted in a judicial re-writing of the law. Courts are not a super-legislature authorized to expand gambling which has been limited by the Legislature. Both the separation of powers doctrine and the constitutional mandate to the legislature to regulate gambling, forbid as a matter of law, the relief granted by the trial court. While Louisiana courts have the power under Article V § 1 of the constitution to determine the constitutionality of legislation, this power is not unrestrained. It is subject to the separation of powers doctrine which forbids courts from exercising legislative functions. Courts lack authority to regulate gambling. By striking the limitation provision, the trial court altered the legislative intent and created a broader law that will neither limit the number of offtrack wagering establishments, nor regulate the forms of gambling at racetracks. The statutory classification cannot be severed without doing violence to the entire statute. Limitations on gambling serve a legitimate goal and regulation of gambling is a legitimate state interest.
Conceding that limiting gambling protects a strong state interest, plaintiffs argue that the stricken phrase, "during the 1986-87 racing season and licensed prior to the effective date ..." does not limit gambling in a manner which is constitutionally permitted. According to plaintiff, the only purpose of the restrictive phrase is to confer special privileges to the tracks existing in 1986-87, and to deny equal rights to any association which the Racing Commission issues a license to replace a closed track.
Our decision in Sibley v. Bd. of Sup'rs of Louisiana State U., 477 So.2d 1094 (La.1985) provided an analysis regarding the multilevel system required to determine whether an individual's right to equal protection as guaranteed by Article I, Section 3 of the 1974 state constitution has been violated. This portion of the constitution commands courts to reject enforcement of a legislative classification of individuals under the following circumstances:
(1) When the law classifies individuals by race or religious beliefs, it shall be repudiated completely;
(2) When the statute classifies persons on the basis of birth, age, sex, culture, physical condition, or political ideas or affiliations, its enforcement shall be refused unless the state or other advocate of the classification has a reasonable basis;
(3) When the law classifies individuals on any other basis, it shall be rejected whenever a member of a disadvantaged class shows that it does not suitably further any appropriate state interest.
Sibley, 477 So.2d at 1107, 1108. See also Med Express Ambulance Service, Inc. v. Evangeline Parish Police Jury, 96-0543 (La.11/25/96), 684 So.2d 359.
Individuals challenging a legislative classification based on grounds other than discrimination because of birth, race, age, sex, social origin, physical condition, or political or religious ideas must show that the law was unreasonable, or that it did not further *154 any appropriate state interest. Sibley, 477 So.2d at 1108. Recently, we followed this same legal principle when we decided Manuel v. State, 95-2189 (La.7/2/96), 677 So.2d 116, which involved a minimum drinking age. Classifications on any basis other than those expressed in Art. I, § 3, are reviewed under the minimum standard and must be rationally related to a legitimate governmental purpose. The facts of this case show that the Legislature in enacting the offtrack wagering statutes, decided to allow only those pari-mutuel facilities in existence during the 1986-87 racing season the right to operate offtrack wagering parlors. Therefore, we are faced with at least two distinct classes, primary licensees existing during and prior to the 1986-87 racing season, and license holders such as Livingston Downs which acquired their license to become a pari-mutuel facility subsequent to the 1986-87 season. Case law shows that the equal protection clause does not forbid classification. However, where such legislation is enacted, the classification must be reasonable and not arbitrary, and must rest upon some basis of difference with a fair and substantial relation to the object of the legislation. All persons similarly situated must be treated identically. Stated differently, "It simply keeps governmental decisisonmakers from treating differently persons who are in all relevant respects alike." Nordlinger v. Hahn, 505 U.S. 1, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992), citing F.S. Royster Guano Co. v. Virginia, 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920).
In Nordlinger, a taxpayer who had purchased a Los Angeles home challenged California's property tax system that embodied an acquisition value system of taxation whereby property was reassessed up to the current appraised value of new construction or when ownership changed.[5] The home was purchased in November 1988 for $170,000 from the previous owners who had bought the home for $121,500 two years prior to her purchase.
The county's tax assessor sent notice informing petitioner that her home had be reassessed to $171,100 based on the change of ownership, causing a 36% tax increase. Petitioner later discovered that she was paying in some instances, five times more in taxes than some of the surrounding properties with comparable values. Some individuals who were paying lower taxes had owned these comparable homes since 1975. Petitioner showed as an example of the disparity, that her total property taxes for a 10 year period would approach $19,000 whereas a neighbor's home of comparable size which was purchased in 1975 would only pay $4,100 during that same time period.
The Supreme Court applied the minimum standard of scrutiny to determine if there was a rational basis for the disparity, and upheld the constitutionality of the tax amendment. The court opined that California has a legitimate interest in local neighborhood preservation, stability and continuity. Assessing the higher tax on new owners at the time of purchasing their property resulted in a decrease in the turnover of ownership.
A case which bears close resemblance to the instant facts is City of New Orleans et al, v. Dukes, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976). Nancy Dukes operated a pushcart containing food in the French Quarter of the city for only two years when a city ordinance was passed designated to curtail the number of pushcart vendors operating in the French Quarter. Her action attacking the validity of the ordinance was filed in federal court. In 1972, the ordinance was amended to provide an exception for vendors who had operated the same business in the French Quarter for eight years, prior to January 1, 1972. Dukes' action was then amended to challenge the application of the ordinance's "grandfather clause" as a denial of equal protection. The district court granted the city's motion for summary judgment. On appeal, the Fifth Circuit reversed.
The Supreme Court reversed the decision of the appellate court and determined that the grandfather clause did not deny the plaintiff equal protection. The court held that the amended ordinance, including the *155 grandfather clause, is purely an economic regulation aimed to preserve the custom, appearance and uniqueness of the French Quarter's tourist-oriented charm which adds to the economy of the City of New Orleans. Rather than abolishing all pushcart vendors, the city had rationally chose to eliminate the vendors who had recently obtained their permits to operate pushcarts in the French Quarter.
In order to withstand the test of constitutionality, the offtrack wagering statutes must meet the minimum standard and be rationally related to a legitimate governmental purpose. To hold otherwise, Livingston Downs has the stringent burden of demonstrating that the law does not suitably further any appropriate state interest. The evidence in this case shows that the main thrust behind the establishment of offtrack wagering was a way to increase the economy of the racing industry. Clearly, the legislature's intent for enacting offtrack wagering was to overcome the racing industry's financial woes. The attendance at racetracks was declining, along with the revenues generated therewith. With the additional revenues from the offtrack racing parlors, the state's economy prospered because other businesses expanded and additional jobs were created. In Dukes, the court determined that the city's ordinance by which it reduced the number of pushcart vendors in the French Quarter was rationally related to a legitimate government purpose. We find that LSA-R.S. 4:211(5) also passes constitutional muster. The evidence reveals that the statute is rationally related to the state's economic interest, and even plaintiff agrees that by limiting gambling, the state's interest is protected. Therefore, Livingston Downs' argument in favor of equal classification with the other primary licensees is meritless. Accordingly, we reverse the trial court's ruling which held that the statute violates plaintiff's right to equal protection.

Is LSA-R.S. 4:211(5) a local or special law?
The pertinent parts of Art. 3, § 12 entitled "Prohibited Local and Special laws" provides:
A. Prohibitions. Except as otherwise provided in this constitution, the legislature shall not pass a local or special law:
(6) Regulating labor, trade, manufacturing or agriculture ...
(7) Creating private corporations, or amending, renewing, extending, or explaining the characters thereof; granting to any private corporation, association, or individual any special or exclusive right, privilege, or immunity.
We must determine what constitutes a special or local law. This issue can be traced as far back as the last century. In State v. Dalon, 35 La.Ann. 1141 (1883), the court found the real distinction between public or general laws, and local or special laws, is that public/general laws affect the community as a whole, whether throughout the State or one of its subdivisions. On the other hand, local/special laws benefit private persons, private property and local or private interests.
The issue was before us in Lakeside Imports, Inc. v. State, 94-0191 (La.7/5/94), 639 So.2d 253. As a licensed motor vehicle dealer, plaintiff challenged the constitutionality of LSA-R.S. 51:193 because the statute prohibits the sale of new or used cars on Sundays. In addition to a challenge based on equal protection grounds, plaintiff alleged that the statute was a "special" law. In upholding the trial court's dismissal of the suit, we determined that the statute was not "special" legislation. Relying on State v. Clement, 188 La. 923, 178 So. 493 (1938) we found "A law is considered special if it affects only a portion of the citizens or is restricted in its operation to persons or places which do not comprise all the objects or persons which naturally belong to the class." Lakeside Imports, Inc., 639 So.2d at 258.
We choose to follow this court's well reasoned opinion in Polk, 626 So.2d 1128. In that case, plaintiff challenged the state's decision to license a single major gambling facility and locate it in one city. We decided that the best suited single location was the Rivergate site located in New Orleans. Speaking in general terms, a statute is considered special or local if its restrictions can affect only a portion of the citizens or a *156 fraction of the property embraced within the created classification. Whereas, laws are considered general if persons or things throughout the state are affected, if it operates on a subject in which the people at large are interested or operates over the whole territory of the state instead of just a particular locality. Where persons throughout the state are affected, or if a law operates on a subject in which the people at large are interested, even though its application and immediate effect is restricted to a particular locality, a statute is not a local or special law. See also, Louisiana Paddlewheels v. Louisiana Riverboat Gaming Com'n, 94-2015 (La.11/30/94), 646 So.2d 885.
Contrary to the trial court's holding, we find that the statute at issue was enacted in furtherance of a general and public purpose. The statute falls within chapter 4 of our revised statutes entitled "Racing". While the purpose of horse racing is clearly set forth in LSA-R.S. 4:142, the House Committee which offered the bill to the full House heard testimony by the bill's sponsor concerning the purpose of the offtrack wagering statutes. In a Commerce Committee meeting on May 28, 1987, State Representative Benoit explained the purpose of House Bill No. 1153.[6] According to the representative, legalized offtrack wagering was needed not only by the racing facility, but the entire industry and further explained that the breeding farms, race tracks, as well as hotels and restaurants in the areas would benefit. In a subsequent meeting on June 23, 1987, he provided testimony that offtrack wagering would create approximately 1200 new jobs and increase the state's revenues by $4.5 million and local government revenue by $6 million.
Representative Benoit's theme of more revenue for the state and the fact that other businesses prospered with the addition of offtrack wagering in Louisiana was noted in the findings of the First Circuit. The appellate court opined:
Ordinarily, legislative intent is, at best a signpost for interpretation. Here, the intent forms part of the statute itself. At the time the statutes were passed, the five pari-mutuel facilities licensed to conduct live horse racing were facing a decline in racing revenues. The number of "on track" patrons was dying out. The horse racing statutes were enacted as a means of protecting and preserving live horse racing. The preservation of "live racing" meant that the breeding industry would continue to exist. With the breeding industry, other business spawned: such as veterinary services, fencing construction workers, feed suppliers, farriers, hot walkers, training facilities, and real estate sales and development.
Offtrack wagering was viewed as a means to secure additional revenue for those tracks in existence at the time the offtrack wagering statutes were enacted. Had Livingston Downs been in existence at that time, it too would have benefitted from the offtrack provisions of the law.

See Livingston Downs Racing Association, Inc., 653 So.2d at 1314.
Without question, the surrounding parishes, cities, towns and political subdivisions near the pari-mutuel facilities offering offtrack wagering benefit because of the proximity and location of these facilities, however the evidence of this case shows that the state as a whole benefits due to the additional revenues and employment opportunities. Consequently, the lower court erred by failing to conclude that the statute meets the definition of a general law as opposed to special or local legislation.

Is LSA-R.S. 4:211(5) being enforced selectively?
Attempting to distinguish Dukes from the instant matter, the trial court concluded that because the Racing Commission continued to issue licenses, there was no "Grandfather Clause" that allowed different treatment to racing associations formed after the 1986-87 racing season. His rationale was based on Livingston Downs being issued a license to replace Jefferson Downs' race dates subsequent to the year at issue. He further concluded that the Racing Commission arbitrarily and capriciously applied the statute to *157 Livingston Downs when it applied for an offtrack wagering license because Old Evageline Downs, L.C. was formed nearly two years after Livingston Downs. The latter association was allowed the privilege of offtrack wagering. The trial court reached the same conclusion when referring to Finish Line Management.
Once again, the evidence in this case proves that the trial court's conclusions were patent error. The record shows that the ownership of First Statewide Racing d/b/a New Evangeline Downs transferred to Old Evangeline Downs, L.C. in December, 1994. There was no transfer of the physical racetrack, only the association conducting racing at the facility formerly known as Evangeline Downs. A similar situation took place regarding the offtrack wagering parlors operated by Jefferson Downs. Finish Line Management is owned and operated by Bryan and Marie Krantz who are also the owners of the Fair Grounds, Corp. With this subsequent transfer of ownership there was no newly created racing facility conducting offtrack wagering because of the closure at Jefferson Downs. The only thing which transferred was the ownership of the facilities and not the facilities themselves.
Under LSA-R.S. 4:211(7), in order to become a primary licensee, the licensed racing association must conduct the majority of horse races at a pari-mutuel facility. After receiving a license to offer live horse races, not only has Livingston Downs failed to conduct the majority of races at pari-mutuel facility, they failed to conduct a single race. We therefore reverse the trial court's conclusion that the Racing Commission arbitrarily enforced LSA-R.S. 4:211(5).

Decree
Because we hold that LSA-R.S. 4:211(5) is not a local or special law, is rationally related to a legitimate governmental purpose and is not being selectively enforced, the award for attorney's fees is vacated and set aside.
REVERSED.
KNOLL, J., concurs in the results only.
LEMMON, J., dissents and assigns reasons.
KIMBALL, J., not on panel. Rule IV, Part 2, § 3.
LEMMON, Justice, dissenting.
The effect of La. Rev. Stat. 4:211(5)'s restrictive definition of "pari-mutuel facility" is to grant the privilege of offtrack wagering only to those facilities existing at the time of the statutory enactment and to deny the privilege to subsequently licensed pari-mutuel facilities, including those which replace pari-mutuel facilities that were in existence at the pertinent time. While the limitation of offtrack wagering to pari-mutuel facilities that conduct race meetings is rationally related to the legitimate governmental purpose of permitting maximum development of the horse racing industry and of stabilizing the shaky economy of that industry, the further limitation to pari-mutuel facilities existing in 1987 is not. The additional limitation, which denies to pari-mutuel facilities licensed after 1987 the attractive income of offtrack wagering that was deemed necessary to the continued successful operation of all pari-mutuel facilities, does not further any legitimate governmental objective, and actually is contrary to the goal of maximizing development of the industry.[1] The discriminatory classification created by the additional limitation therefore violates the constitutionally required equal protection of the law.
NOTES
[1] Louisiana Constitution Art. 5, § 5(D) provides in part that a case shall be appealable to the Supreme Court if an ordinance or law is declared unconstitutional.
[2] See Plaintiff's exhibit 43. Louisiana State Racing Commission meeting at page 124.
[3] Commissioner Darlene Ranson now serves as an attorney for plaintiff, Livingston Downs.
[4] The history and source of law provides:

An Act to enact Part I-A of Title 4 of the Louisiana Revised Statutes of 1950, to be comprised of R.S. 4:211 through 222 relative to horse racing, to authorize offtrack wagering, to provide for offtrack wagering facilities, to provide for licensure of such facilities, to provide for ownership of such facilities, to provide for commission on wagers, to provide for purse supplements, to authorize the collection of a license fee and disbursement of receipts, and to provide for related matters. Acts 1897, No. 203.
[5] Changes of principal residences by citizens over 55 and transfers between parents and children were exemptions to this law.
[6] This bill was added by Acts 1987, No. 203, § 1.
[1] The Fair Grounds, an intervenor, argues that an additional purpose of the legislation is to prevent new race tracks from becoming a "front" for other forms of gambling. However, numerous safeguards in the licensing of pari-mutuel facilities render the discriminatory classification superfluous.