# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE
NEWS RELEASE #014

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **21st day of March, 2025** are as follows:

**BY Crain, J.:**

2024-CA-00995
consolidated with
2024-CA-0096

DONOVAN FREMIN, STAN GUIDROZ, WILLIAM EDWIN JUDSON, JR., LUKE LABRUZZO, JR., RAWLSTON PHILLIPS, III AND SALVADOR P. TANTILLO, III VS. BOYD RACING, LLC, CHURCHILL DOWNS LOUISIANA HORSERACING COMPANY, LLC LOUISIANA DOWNS INVESTMENT COMPANY, LLC AND OLD EVANGELINE DOWNS, LLC (Parish of East Baton Rouge)

AFFIRMED. SEE OPINION.

Justice Jeanette Theriot Knoll, retired, heard this case as Justice Pro Tempore, sitting in the vacant seat for District 3 of the Louisiana Supreme Court. She is now appearing as Justice ad hoc for Justice Cade R. Cole.

# SUPREME COURT OF LOUISIANA

## No. 2024-CA-00995
## consolidated with 2024-00996

## DONOVAN FREMIN, STAN GUIDROZ, WILLIAM EDWIN JUDSON, JR., LUKE LABRUZZO, JR., RAWLSTON PHILLIPS, III AND SALVADOR P. TANTILLO, III

## VS.

## BOYD RACING, LLC, CHURCHILL DOWNS LOUISIANA HORSERACING COMPANY, LLC LOUISIANA DOWNS INVESTMENT COMPANY, LLC AND OLD EVANGELINE DOWNS, LLC

On Appeal from the 19th Judicial District Court, Parish of East Baton Rouge

**CRAIN, J.**[*]

This is a direct appeal from a district court judgment declaring unconstitutional 2021 La. Acts, No. 437, which Act legalized historical horse racing without requiring voter approval in the affected parishes. We affirm.

### FACTS AND PROCEDURAL BACKGROUND

Louisiana law authorizes pari-mutuel wagering on horse racing. All other forms of betting on the result of horse races are illegal. La. R.S. 4:149.

In 2021, the legislature passed Act 437, which amended the statutes that regulate betting on horse racing, to incorporate historical horse racing as a form of pari-mutuel wagering. In contrast to betting on live horse races, historical horse racing is a gaming system that uses an algorithm based on the results of previously run horse races, with bets made at a terminal or machine similar in appearance to a slot machine. In recent years, the legality of historical horse racing has been questioned in other states where pari-mutuel wagering on horse races is legal, prompting the passage of laws clarifying that historical horse racing is a type of pari-

---

[*] Justice Jeanette Theriot Knoll, retired, heard this case as Justice Pro Tempore, sitting in the vacant seat for District 3 of the Louisiana Supreme Court. She is now appearing as Justice ad hoc for Justice Cade R. Cole.

mutuel wagering on horse races.  Likewise, Act 437 defined historical horse racing as a form of pari-mutuel wagering on horse races.  Because the term was not previously statutorily defined,[1] Act 437 defined pari-mutuel wagering to include wagering on horse races, whether live, simulcast, *or previously run*."  The Act authorized historical horse racing only at offtrack betting facilities that were licensed to conduct pari-mutuel wagering.

Voters and residents in five parishes where historical horse racing is being, or could be, conducted at offtrack betting facilities, sued challenging the constitutionality of Act 437.[2]  Their argument is Article XII, section 6(C) of the Louisiana Constitution, as amended in 1996, requires voter approval for any new form of gaming not specifically authorized before the effective date of the amendment.  Plaintiffs requested a judgment declaring Act 437 unconstitutional for allowing historical horse racing without prior voter approval, as well as injunctive relief prohibiting historical horse racing.[3]

---

[1]     Pari-mutuel wagering is discussed extensively in *Gandolfo v. Louisiana State Gaming Com'n*, 227 La. 45, 78 So. 2d 504 (La. 1954).

[2]     Plaintiffs are Donovan Fremin (Lafourche Parish), Stan Guidroz (Lafayette Parish), William Edwin Judson, Jr. and Luke Labruzzo, Jr. (Jefferson Parish), Rawlston Phillips, III (West Baton Rouge Parish), and Salvador P. Tantillo, III (St. Tammany Parish).  The record establishes multiple plaintiffs own, either directly or indirectly, an interest in a facility offering gaming or video poker, or have family members who own or have an interest in facilities offering gaming or video poker.

[3]     Plaintiffs named as defendants Boyd Racing, LLC, d/b/a Delta Downs Racetrack Casino & Hotel, Churchill Downs Louisiana Horseracing Company, LLC, d/b/a Fairgrounds Racehorse and Slots, Louisiana Downs Investment Company, LLC, and The Old Evangeline Downs, LLC, d/b/a Evangeline Downs Racetrack and Casino.  Pursuant to a consent judgment, Boyd Racing and The Old Evangeline Downs were dismissed with prejudice and those defendants agreed not to take any position in this case as to the constitutionality or legality of historical horse racing and to conduct historical horse racing only as allowed by order of the court.  As used herein, "defendants" refers to Churchill Downs and Louisiana Downs.  The Louisiana Horsemen's Benevolent Protective Association, LLC, and the Louisiana State Racing Commission intervened to oppose plaintiffs' request for a judgment declaring Act 437 unconstitutional.  The Attorney General was served with a copy of the petition, as required by La. Code Civ. Pro. art. 1880, and is representing the Racing Commission in this matter but chose not to participate as a party.  *See Vallo v. Gayle Oil Co., Inc.*, 94-1238 (La. 11/30/94), 646 So. 2d 859, 865 (explaining the Attorney General must be served in declaratory judgment actions that seek a declaration of unconstitutionality of a statute but is not an indispensable party).

Defendants countered that Act 437 simply codified the definition of pari-mutuel wagering, the original and favored form of lawful gaming in Louisiana. They further argued that historical horse racing is a new technology, not a new form of gaming. Defendants contend that because pari-mutuel wagering is not new, and is authorized by law, historical horse racing is not new and does not require a local vote. They further contend Act 437 is an appropriate exercise of the legislature's constitutional authority to define what is, and is not, gambling.

After finding plaintiffs have standing to assert the constitutional challenge, the trial court granted summary judgment for plaintiffs, declared historical horse racing a new form of gaming requiring local voter approval, and declared Act 437 unconstitutional.[4] The subject appeals followed.[5]

## DISCUSSION

### Standing

A party seeking a declaration of unconstitutionality must have standing to raise the challenge. *Kinnett v. Kinnett*, 2020-01134 (La. 10/10/21), 332 So. 3d 1149, 1156. Standing is a concept used to determine if a party is sufficiently affected so as to ensure a justiciable controversy is presented to the court. *Broome v. Rials*, 2023-01108 (La. 4/26/24), 383 So. 3d 578, 584. A party has standing only when that party's own rights are seriously affected. That means the party must complain of a constitutional defect in the application of the statute to him or herself, not a defect as applied to third parties in hypothetical situations. *Kinnett*, 332 So. 3d at 1157. If the party bringing the challenge has an interest at stake that can be legally protected, the predicate requirement of standing is satisfied. *Shepherd v. Schedler*, 2015-1750

---

[4]     The district court pretermitted ruling on plaintiffs' request for a permanent injunction pending trial on the matter.

[5]     Because the district court declared Act 437 unconstitutional, we have exclusive appellate jurisdiction over these appeals pursuant to La. Const. art. V, §5(D).

3

(La. 1/27/16), 209 So. 3d 752, 762. Standing is gauged by the specific statutory or constitutional claims at issue and the party's relationship to those claims. *In re Melancon*, 2005-1702 (La. 7/10/06), 935 So. 2d 661, 668 (*citing International Primate Protection League v. Administrators of Tulane Educational Fund*, 500 U.S. 72, 77, 111 S.Ct. 1700, 1704, 114 L.Ed.2d 134 (1991)).

Article XII, §6(B) deals with gaming, gambling, or wagering and provides that the legislature shall define and suppress gambling. The 1996 amendments added subsections (C)(1)(a) and (b), which require voter approval before a new form of gaming, gambling or wagering is allowed. Relying on the express requirement of prior voter approval, plaintiffs claim standing as voters protecting their fundamental right to vote.[6] We agree.

The legislature has plenary power to pass laws not expressly prohibited by the constitution. *Bienvenu v. Defendant 1*, 2023-01194 (La. 6/12/24), 386 So. 3d 280, 289 (on rehearing). But, where the legislative power is restricted, that power is reserved to the people. Here, new forms of gaming introduced after the 1996 amendment expressly require prior local voter approval. A law creating a new form of gaming after that date, which does not include the requirement of prior local voter approval, denies each and every voter in the affected parish the fundamental right to vote. Those voters have standing to assert that right in court. Plaintiffs are in that category, thus, they have standing to challenge the constitutionality of Act 437.

---

[6] Defendants concede the parishes themselves could claim an injury giving rise to standing. The St. Tammany Parish Government, the City of Slidell, the City of Gretna, and the City of Westwego have filed *amicus curiae* briefs in this Court, opposing defendants' appeal, and asserting the district court's declaration of unconstitutionality should be affirmed. Both the St. Tammany Parish Government and the City of Slidell participated in oral argument and advised the Court they are plaintiffs in another case pending in the district court against defendant, Churchill Downs, seeking injunctive relief prohibiting historical horse racing operations before approval by voters in a referendum election. The St. Tammany Parish Government has indicated it agrees the constitutional issues should be resolved in this case for purposes of judicial efficiency.

**Constitutionality of Act 437**

Generally, legislative acts are presumed constitutional and the party challenging an act's validity bears the burden of proving it is unconstitutional. *State v. Spell*, 2021-00876 (La. 5/13/22), 339 So. 3d 1125, 1130-31. This presumption is especially forceful for statutes promoting a public purpose, such as those relating to public finance. *Polk v. Edwards*, 626 So. 2d 1128, 1132 (La. 1993). The legislature's power derives from the citizens who freely elect their legislative representatives, and the Louisiana Constitution serves as a limitation on the legislature's otherwise plenary power. The legislature can enact any legislation not prohibited by the state constitution. *Polk*, 626 So. 2d at 1132. When a constitutional challenge is made, the question is whether the constitution restricts the legislature, either expressly or impliedly, from enacting the statute. *Caddo-Shreveport Sales and Use Tax Com'n v. Office of Motor Vehicles Through Dept. of Public Safety and Corrections*, 97-2233 (La. 4/14/98), 710 So. 2d 776, 780.

Article XII, §6(B) provides that "[g]ambling shall be defined and suppressed by the legislature." Historically, the constitution recognized gambling as a vice which posed a threat to public health and public morals. *Casino Ass'n of Louisiana v. State ex rel. Foster*, 2002-0265 (La. 6/21/02), 820 So. 2d 494, 504 (*quoting Penn v. State ex rel. Foster*, 99-2337 (La. 10/29/99), 751 So. 2d 823, 849 (Knoll, J., dissenting).), *cert. denied*, 537 U.S. 1226, 125 S.Ct. 1252, 154 L.Ed.2d 1087 (2003); *Latour v. State*, 2000-1176 (La. 1/29/01), 778 So. 2d 557, 562. While the 1973 constitution removed that express moral condemnation, it mandated that the legislature define and suppress gambling. That has been recognized as empowering the legislature to authorize or outlaw gambling as it chooses. *See Polk*, 626 So. 2d at 1141. "The power to suppress gambling and to determine how, when, where, and in what respects gambling shall be prohibited or permitted has been delegated to the legislature and the legislature alone." *Polk*, 626 So. 2d at 1137.

5

As amended in 1996, Article XII, in relevant part, provides:

**(C) Gaming, Gambling, or Wagering Referendum Elections.** (1)(a) No law authorizing a new form of gaming, gambling, or wagering not specifically authorized by law prior to the effective date of this Paragraph [(October 15, 1996)] shall be effective nor shall such gaming, gambling, or wagering be licensed or permitted to be conducted in a parish unless a referendum election on a proposition to allow such gaming, gambling, or wagering is held in the parish and the proposition is approved by a majority of those voting thereon.

(b) No form of gaming, gambling, or wagering authorized by law on the effective date hereof [(October 15, 1996)] shall be licensed or permitted to be conducted in a parish in which it was not heretofore being conducted, except licensed charitable gaming which may be conducted in any parish provided it is conducted in compliance with the law, pursuant to a state license or permit unless a referendum election on a proposition to allow such gaming, gambling, or wagering is held in the parish and the proposition is approved by a majority of those voting thereon.

Thus, the Constitution grants the legislature the power to define gambling in Section 6(B), then, in Section 6(C) requires local elections for new forms of gambling not specifically authorized before October 15, 1996.

By defining pari-mutuel wagering to include historical horse racing, defendants argue the legislature determined historical horse racing is not a new form of gaming. Defendants then argue the separation of powers doctrine requires that the judiciary defer to the legislature's express authority to define and regulate gambling.

The concept of separation of powers is found in Louisiana Constitution Article II, section 2, which provides, "Except as otherwise provided by this constitution, no one of these branches, nor any person holding office in one of them, shall exercise power belonging to either of the others." The legislative branch enacts the law, the executive branch enforces the law, and the judicial branch interprets and construes the law. *See* La. Const. arts. III, IV, and V; *see also Wooley v. State Farm Fire & Cas. Ins. Co.*, 2004-882 (La. 1/19/05), 893 So. 2d 746, 762. The Louisiana

Constitution is the supreme law to which all legislative acts must yield. *See* La. Const. art. XIV, §18; *Saloom v. Department of Transportation and Development*, 2022-00596 (La. 12/9/22), 354 So. 3d 1179, 1183. The judicial branch has the duty to determine whether legislative or executive actions exceed the constitutional authority vested in them. *Graham v. Jones*, 198 La. 507, 608, 3 So. 2d 761, 794 (1941). Thus, it is our constitutional duty to interpret Article XII and Act 437 to determine whether the legislature exceeded its authority by defining historical horse racing in a way that does not require prior voter approval.

Generally, articles of the constitution are construed and interpreted using the same principles applicable to statutes. *Snowton v. Sewerage and Water Board*, 2008-399 (La. 3/17/09), 6 So. 3d 164, 168. The starting point for interpretation of a constitutional provision is the language of the provision itself. *See Menard v. Targa Resources, L.L.C.*, 2023-00246 (La. 6/27/23), 366 So. 3d 1238, 1241; *Mellor v. Parish of Jefferson*, 2021-0858 (La. 3/25/22), 338 So. 3d 1138, 1141 (quoting *Civil Service Comm'n of City of New Orleans v. City of New Orleans*, 2002-1812 (La. 9/9/03), 854 So. 2d 322, 330). Words and phrases of a constitutional provision must be read in context and construed according to the common and approved usage of the language. *See* La. R.S. 1:3. Such provisions are construed to give effect to the purpose indicated by a fair interpretation of the language used. Where a constitutional aim is evident from the language used, courts need not consider the historical basis for a constitutional prohibition and may not, by separately considering related constitutional provisions, arrive at a construction that detracts from the manifest meaning of the related provisions. *Perschall v. State*, 96-0322 (La. 7/1/97), 697 So. 2d 240, 255.

Article XII confirms the legislature's authority to define gambling and suppress it, harkening to this Court's decisions in *Polk* that determined the legislature had the constitutional authority to enact four acts concerning the licensing and

regulation of gambling (the Casino Act, the Riverboat Gaming Act, the Cruiseship Gaming Act, and the Video Poker Act). *Polk*, 626 So. 2d at 1141. By its plain language, Section 6(C) requires voter approval 1) before a law authorizing a new form of gaming, gambling, or wagering not specifically authorized before October 15, 1996, becomes effective in the parish; and 2) before a form of gaming or wagering authorized before October 15, 1996, but not previously conducted, is allowed to be conducted in the parish.

Historical horse racing was not expressly authorized before the passage of Act 437. Plaintiffs' gaming expert traced its earliest development to patent applications submitted in 1998. Without dispute, it did not exist when the 1996 amendment to Article XII became effective in October 1996. In 2000 the first historical horse racing system in the United States was introduced in Arkansas and called "Instant Racing."

With historical horse racing, bets are placed on the predicted finishing position of as many horses as possible across multiple completed races. For example, one bet might involve selecting the finishing positions of eight horses in each of ten races. Betting takes place at a machine similar to a slot machine, with displays showing spinning symbol-bearing reels and using the same game themes as Las Vegas-style video slot machines that are driven by internal random number generators. Neither the game themes nor the graphic displays necessarily depict or reference horses or horse racing. A player places a bet using a bill validator that allows cash or cash equivalents before starting game play. The machine's "electronic totalizator" pools the bets. The machine then uses a random number generator to choose a compilation of previously run horse races in which the player bets on anonymous horses' finishing positions. The player may choose to manually select the finishing position within a set time frame based on statistical information provided. All of the statistical information is anonymous—players are not given the

identities of the races, horses, trainers, or jockeys. Alternatively, players may choose an automatic selection, *i.e.*, press a "spin" button. The payout is based on the selected finishing positions of horses, not the winners of the races, with payment made from the betting pool. Losing bets remain in the pool and carry forward to increase the potential payoff for future bets. Thus, the machine allows continuous game play; however, each bet involves different races and horses.

Before the 1996 amendment, Louisiana law authorized betting only on *live* horse races. *See* La. R.S. 4:141 et seq.; La. R.S. 4:213 (requiring offtrack wagering facilities to broadcast a live simulcast of the race); *Gandolfo v. Louisiana State Racing Commission*, 78 So. 2d 504, 508-09 (La. 1954); *Livingston Downs Racing Ass'n, Inc. v. State*, 96-2890 (La. 12/2/97), 705 So. 2d 149, 150. In 1987, statutes were passed to allow live simulcasts of horse races at offtrack betting facilities. *See* La. R.S. 4:211; La. Acts 1987, No. 203; *Livingston Downs Racing Ass'n, Inc. v. State*, 96-2890 (La. 12/2/97), 705 So. 2d 149, 150. The purpose was to maximize development of the horse racing industry with pari-mutuel wagering, breeding and ownership of racehorses. *See* La. R.S. 4:142; *Livingston Downs Racing Ass'n, Inc.*, 705 So. 2d at 152. A live simulcast of a race from the host track was required. La. R.S. 4:213. Approval by voters in an affected parish was a prerequisite to licensing an offtrack betting facility. La. R.S. 4:214; La. Acts 1987, No. 203. Elections were held and approved in multiple parishes, including St. Tammany and Jefferson.

Historical horse racing does not involve betting on live horse races. It is a gaming system developed and patented to use slot machine-like gaming terminals for game play. Prior horse races are only used to create the betting algorithm. Betting bears little, if any, relation to betting on a live horse race, often involving only a random wheel spin that renders historical horse racing the equivalent of a slot machine using horse racing to brand the device. The offtrack wagering law never authorized this form of gaming, which was not even invented when offtrack

wagering was enacted. Based on our *de novo* review of the evidence, Act 437 authorizes a new form of gaming not authorized in Louisiana before October 15, 1996. Thus, the Louisiana Constitution requires prior voter approval of historical horse racing in a local election.

The subject constitutional challenge is limited to whether Section 6(C) requires voter approval for historical horse racing. There are no genuine issues of material fact as to that issue. On the specific constitutional challenge presented and on the record before us, we interpret Article XII to require approval by local option vote in an affected parish before historical horse racing is licensed or permitted to be conducted in that parish. Act 437 is unconstitutional.[7]

## CONCLUSION

We affirm the district court's judgments that denied the exceptions of no right of action and declared Act 437 unconstitutional.

**AFFIRMED.**

---

[7] The issue of whether historical horse racing is pari-mutuel wagering has arisen in multiple states. In support of their argument historical horse racing is not actually pari-mutuel wagering, plaintiffs cite those jurisdictions as persuasive authority, including *Family Trust Foundation of Kentucky, Inc. v. Kentucky Horse Racing Commission*, 620 S.W.3d 595, 601 (Ky. 2020) (finding instant racing machines did not facilitate pari-mutuel wagering, which requires that patrons generate the pools based on wagering on the same discrete, finite events); and *Wyoming Downs Rodeo Events, LLC v. State*, 134 P.3d 1223, 1230 (Wyo. 2006) (concluding instant racing terminals are slot machines that attempt to mimic traditional pari-mutuel wagering). Defendants counter that those cases merely establish it is for the executive branch to determine whether historical horse racing falls within the definition of pari-mutuel wagering, which was done in Louisiana.