LIVINGSTON DOWNS RACING
ASSOCIATION, INC.,
Plaintiff,

v.

JEFFERSON DOWNS
CORPORATION, et
al., Defendants.

United National Insurance
Corporation, et al.,

v.

Jefferson Downs Corporation, et al.

Civ. A. Nos. 96–3430–D, 97–18–D.

United States District Court,
M.D. Louisiana.

Aug. 13, 2001.

Provino C. Mosca, Mosca & Mosca, New Orleans, LA, Darlene Sansone Ransome, Baton Rouge, LA, J. Marvin Montgomery Baton Rouge, LA, David T. Ralston, Jr., Steven C. Lambert, Roderick V. Williams, Ransome Law Firm, Baton Rouge, LA, for plaintiff.

Vance A. Gibbs, Charles S. McCowan, Jr., Bradley Charles Myers, Shannan Sweeney Rieger, Troy J. Charpentier, James P. Dore, Kean, Miller, Hawthorne,

D'Armond, McCowan & Jarman, Baton Rouge, LA, for Jefferson Downs, Corp., Fair Grounds Corp., Inc., Finish Line Management, Inc., Bryan Krantz, Marie Krantz, Committee to Control Gambling, Peter Henry, George Boudreaux, defendants.

Michael A. Patterson, Daniel D. Holliday, III, Long Law Firm, LLP, Baton Rouge, LA, Andrew C. Engolio, Baton Rouge, LA, for Larry Bankston, defendant.

Amos H. Davis, Craig J. Fontenot, Smith and Davis, Baton Rouge, LA, for General Agents Ins. Co. of America, Inc., defendant.

## MEMORANDUM RULING

BRADY, District Judge.

Before the Court is the Defendants' motion for summary judgment urging dismissal of both the Plaintiffs' antitrust and civil Racketeering Influenced and Criminal Organizations (RICO) claims. Regarding the antitrust claims, the Defendants assert that their actions, though admittedly anticompetitive, represent a good-faith effort to petition the Government for favorable action. As a result, these actions come within the aegis of the *Noerr–Pennington* doctrine, which shields from antitrust liability a private party's efforts to obtain, through government action, a competitive advantage over business rivals. The Plaintiffs counter that the Defendants undertook a campaign of repetitive, baseless litigation, the sole purpose of which was to burden the Plaintiffs with the costs and delays which attend the litigatory process. The Defendants' actions thus fall under the "sham litigation" exception to the *Noerr–Pennington* doctrine and are subject to antitrust liability, the Plaintiffs contend. The Court concludes that the Plaintiffs have raised a genuine dispute as to whether the Defendants' actions were pre-

dominantly motivated by a desire to hinder the Plaintiff's ability to obtain financing. Accordingly, the Court holds that the Defendants are not entitled to summary judgment on the Plaintiffs' antitrust claims.

As to the civil RICO claims, the Defendants argue that the Plaintiffs, having suffered no concrete injury as a result of the Defendants' actions, lack standing to bring such a claim. The Defendants also urge that any such claims are barred by the doctrine of *res judicata*. Accordingly, the motion to dismiss the Plaintiff's antitrust claims must be granted.

### Background

This hoary case stems from the Plaintiffs' failed efforts to open a racetrack for live horse racing in Livingston Parish, Louisiana, and to obtain a license to conduct off-track betting (OTB) operations. This enterprise required the Plaintiffs not only to obtain the appropriate licenses from the Louisiana State Racing Commission (the Commission), but also to secure the voters' approval for horse racing in Livingston Parish through a referendum election. The Plaintiffs aver that they found their efforts to satisfy these requirements opposed at every turn by the Defendants, Bryan and Marie Krantz. According to the Plaintiffs, the Defendants pursued four main avenues in their efforts to thwart the Plaintiffs' bid to enter the market for live horse racing. These include lobbying the Commission and the Louisiana legislature to oppose the Plaintiffs' applications for racing and gaming licenses; campaigning against the new racetrack in the referendum election; filing lawsuits contesting the legitimacy of both the referendum election and the Plaintiffs' racing and gaming licenses; and intervening in the various lawsuits the Plaintiffs filed in an attempt to obtain racing and gaming licenses. The delays engendered by the Defendants' incessant legal challenges and lobbying, the Plaintiffs argue, caused the financing for the proposed racetrack to fall through, eventually scuttling their plans entirely.

### LDRA's Efforts to Obtain a Racing License

Marie and Bryan Krantz owned Jefferson Downs Corporation (Jefferson Downs), a racetrack for live horse racing in Jefferson Parish. Jefferson Downs also possessed an OTB license, which allowed it to conduct off-track wagering both at the racetrack and at other facilities. In 1990, the Krantzes acquired an interest in Fair Grounds Corporation, a racetrack in Orleans Parish which also had an OTB license. In 1992, after the Krantzes had obtained a majority interest in Fair Grounds, they elected to consolidate their operations by shuttering the racetrack in Jefferson Parish and transferring Jefferson Downs's OTB license to Fair Grounds.

Under state regulations, Jefferson Downs and Fair Grounds could not, owing to their geographical proximity, hold races on the same dates. See La.Rev.Stat. §§ 4:147(1) & 4:215(b). Accordingly, prior to its closing, Jefferson Downs had conducted races in the Spring and Summer, whereas Fair Grounds had held races only in the Fall and Winter. The closing of Jefferson Downs thus left a void for live horse racing in Louisiana during the spring and summer months. In hopes of exploiting this opening, Al Ransome formed Livingston Downs Racing Association, Inc. (LDRA) in December 1992. LDRA's business plan called for building a racetrack in Livingston Parish and obtaining an OTB license therefor. LDRA applied to the Commission for a license to conduct horse races on Jefferson Downs' erstwhile race dates. *See Livingston Downs Racing Ass'n v. State*, 96–2890 (La.12/2/97), 705 So.2d 149, 150–51 (recounting the circumstances leading up to the formation of LDRA and its efforts to obtain racing dates).

The Commission approved LDRA's application and voted, on December 12, 1992, to grant it a permit to conduct pari-mutuel horse racing on the dates abandoned by Jefferson Downs. The next step for LDRA was to secure·popular approval for live horse racing in Livingston Parish through a referendum election. See La. Rev.Stat. § 4:181. But before the Commission could issue LDRA's permit, Jefferson Downs and Fair Grounds obtained an order in state court staying the Commission's decision to grant the permit. Jefferson Downs and Fair Grounds subsequently amended their complaint to request an injunction prohibiting the referendum election. The election, they argued, was precipitous in light of the stay on LDRA's license. See Original Complaint ¶¶ 41, 43.

LDRA appealed the order staying the issuance of its license. It prevailed, and the state appellate court ordered the license issued. Jefferson Downs and Fair Grounds, however, appealed to the Louisiana Supreme Court, which reinstated the original order staying the issuance of LDRA's racing permit. Because Jefferson Downs and Fair Grounds omitted to request a stay while they took this appeal to the Louisiana Supreme Court, however, the Commission issued LDRA's permit while the appeal was pending. Since the permit had been issued, the police jury for Livingston Parish added the proposition on live horse racing to an election scheduled for January 16, 1993. See Def.'s Exh. I, *Ransome v. Secretary of State for the State of Louisiana*, No. 67,710, slip op. at 2–3 (Jan. 11, 1993)(detailing the circumstances surrounding the referendum election in Livingston Parish).

LDRA believed that the pendency of the suit challenging its racing license cast doubt upon the propriety of the referendum election. To remove this taint, Al Ransome filed suit seeking a writ of mandamus to compel the Secretary of State to permit the referendum election to proceed. The Krantzes intervened in this suit, urging that the referendum be halted. To obtain standing to challenge the referendum, the Krantzes' attorney, Larry Bankston, solicited the aid of Karen Thomas, a legal secretary in his firm and a resident of Livingston Parish. Ms. Thomas agreed to serve as the titular plaintiff for the petition to intervene, which alleged various procedural improprieties in noticing the referendum election. Also at the behest of the Krantzes' attorney, Ms. Thomas served as the plaintiff in a separate lawsuit which sought a writ of mandamus prohibiting the Secretary of State from holding the referendum election in Livingston Parish. This suit was also predicated in part upon alleged procedural irregularities in noticing the referendum. See Depo. of Karen Thomas at 11–12; see also Def.'s Exh. I, *Thomas v. Secretary of State*, No. 67,728, Division B, 21st Judicial District Court, Parish of Livingston.

The independent suit filed under Ms. Thomas's name was consolidated with Ransome's suit seeking a writ of mandamus. The state trial court concluded that, although there were some troubling deficiencies in noticing the referendum, they were too trifling to warrant cancelling the election. In light of the substantial media coverage the election had received, the court remarked, there was little danger that the "plaintiff was trying 'to pull a fast one' as alleged." More nettlesome in the trial court's view was Thomas's assertion that the election could not proceed because the Louisiana Supreme Court's ruling effectively abrogated the Commission's decision to issue LDRA a racing license.[1] The

1. As noted, the Louisiana Supreme Court reversed the order staying LDRA's racing license. Because Jefferson Downs and Fair Grounds had omitted to request a stay while

trial court determined, however, that as the Commission issued LDRA's license before the Louisiana Supreme Court had ruled, and as there was no stay in place when the Commission issued the license, the license was valid. Accordingly, the district court granted Ransome's writ request and directed the Secretary of State to conduct the referendum election on January 16, 1993. See Thomas, slip op. at 2–5 (Def.'s Exh. I).

Thomas petitioned for an emergency stay of this ruling. She was unsuccessful, and appealed to the Louisiana Supreme Court. She was again rebuffed and requested rehearing before that court; the request was denied. According to the Plaintiffs, Thomas pursued this suit until October 13, 1995, when it was dismissed as moot by Louisiana's First Circuit Court of Appeal. See Original Complaint ¶¶ 64–66.

Having failed to stop the referendum from taking place, the Krantzes undertook to defeat the proposition to allow horse racing in Livingston Parish. To this end, they formed the Committee to Control Gambling, Inc. (CCG), a non-profit organization devoted to campaigning against LDRA in the election. See Plaintiff's Exh. 10. As part of this campaign, CCG allegedly aired a television commercial depicting a child, perched atop an adult's lap, playing video poker. The commercial served to remind voters that approving horse racing would also permit the introduction of OTB parlors into the Parish. CCG also ran print ads and conducted a mass mailing urging voters to reject live horse racing in their parish, but to no avail. See Plntff's Exh. 9. The proposition passed. See id. ¶¶ 49, 52–59, 69.

On February 23, 1993, approximately one month after the referendum election, the Krantzes filed another lawsuit. Fashioned as an election challenge, the suit sought to nullify the election based upon the same procedural anomalies that had been raised in the Thomas lawsuit. Terrance Lee Odom, the husband of another of Bankston's legal secretaries and a resident of Livingston Parish, agreed to serve as the titular plaintiff in this suit, which was filed in Livingston Parish. See Depo. of T. Odom at 9–10. The state district court, observing that the legitimacy of LDRA's racing license was already being contested in a separate lawsuit in Orleans Parish, dismissed Odom's election contest as premature. Odom successfully challenged this ruling on appeal and, more than a year later, the case was remanded for trial. See Odom v. Livingston Parish Police Jury, 637 So.2d 1323 (La.App. 1 Cir.1994) .

On remand, Odom obtained court orders prohibiting the Plaintiffs from deposing him and from conducting discovery. This latter order remained in place until December 5, 1996, when LDRA succeeded in having it lifted. After discovery was completed, LDRA moved for summary judgment. The trial court granted the motion on April 1, 1997, and dismissed the suit. Odom appealed once again, but he withdrew the appeal nearly a year later, on August 18, 1998. See Original Complaint ¶¶ 70, 72–73.

While the first appeal of Odom's election contest was pending, LDRA renewed its application to the Commission for a racing license and requested racing dates for the upcoming season. According to the Plaintiffs, the Commission refused to consider this application until after Jefferson Downs had successfully transferred its OTB license to Fair Grounds. The Plaintiffs ascribe the Commission's temporizing to a fear that granting LDRA a racing license before the transfer was complete

they took this appeal to the Louisiana Supreme Court, however, the Commission issued LDRA's permit while the appeal was pending.

would entitle LDRA to compete with Fair Grounds for the right to assume Jefferson Downs' OTB license. LDRA alleges that the Committee conspired with the Krantzes to postpone considering LDRA's license application in order to safeguard the Krantzes' financial interests and to delay LDRA's entry into the market for live horse racing. See Original Complaint ¶¶ 83–85.

Frustrated with the lack of progress on its application for a racing license, LDRA filed suit seeking a writ of mandamus to compel the Commission to consider the application. Odom intervened in this suit as well. According to LDRA, he was again being used by the Defendants as the putative interested party. Bankston was Odom's attorney of record in this action. As Bankston was also a member of the state legislature, he attempted to invoke his privilege under La.Rev.Stat. § 13:4163 to request that the suit be postponed until the end of the year's legislative session.[2] Bankston's stay request was denied, and the state district court ordered the Commission to consider LDRA's license application at its May 27, 1993, meeting. The Commission granted LDRA a 10–year racing license at that meeting, but not until after it had voted to permit Jefferson Downs to transfer its OTB license to Fair Grounds. The Commission also assigned LDRA racing dates for the 1993–94 racing season. See *id.* ¶¶ 87–88, 92.

*LDRA's Efforts to Obtain a Gaming License*

At the time LDRA received its racing license, Louisiana's gaming statutes conferred the right to operate OTB facilities to anyone holding a primary racing license. See La.Rev.Stat. § 213 (West 1993). A separate statutory provision, however, restricted the right to operate OTB facilities to those race tracks in existence during the 1986–87 racing season. See La.Rev.Stat. § 4:211(5) & (7) (West 1993). Because LDRA had not received a racing license until 1993, this latter statutory provision ostensibly proscribed it from conducting OTB operations.[3] LDRA petitioned the Commission to resolve this statutory ambiguity in its favor and to issue it an OTB license. LDRA made three such license applications, in June and December 1993, and again in January 1994. The Commission, however, refused even to place LDRA's applications on its agenda. See Original Complaint ¶ 95; see also *Livingston Downs Racing Ass'n v. State,* 653 So.2d 1311, 1313 (La.App. 1 Cir.1995), rev'd in part, vacated in part, 96–2890 (La.12/2/97), 705 So.2d 149, rehearing denied (1/9/98).

Unable to obtain an OTB license from the Commission, LDRA filed suit in state court challenging the statute that reserves the right to operate OTB parlors to only those race tracks in operation during or prior to the 1986–87 racing season. See *Livingston Downs,* 653 So.2d at 1313. This restriction, it was argued, violated LDRA's constitutional guarantee to equal protection. LDRA requested the court to declare the statute invalid and to enjoin the Commission from enforcing it. Fair Grounds intervened in this suit and filed a motion for summary judgment, which motion was joined by the Commission. The trial court granted the summary-judgment motion and dismissed the suit on January

---

**2.** Under § 13:4163, a member of the state legislature may request that any lawsuit in which he or she is personally involved, either as a party or as counsel, be continued until after the current legislative session is finally adjourned. See La.Rev.Stat. § 13:4163 (West 1993).

**3.** Apparently aware of this restriction, LDRA had amended its original application for a racing license to omit its request for an OTB license. See *Livingston Downs,* 705 So.2d at 151.

19, 1994. LDRA prevailed on appeal, and the matter was remanded for trial.[4] See *Livingston Downs Racing Ass'n, Inc. v. State*, 653 So.2d 1311, 1313, 1318 (La.Ct. App.1995).

On remand, the Defendants filed numerous pretrial exceptions and were, according to the Plaintiffs, generally intransigent during discovery. The case proceeded to trial nonetheless, with the court declaring the statutes in question unconstitutional. Fair Grounds and the Commission appealed this ruling directly to the Louisiana Supreme Court,[5] where they prevailed. See *Livingston Downs*, 705 So.2d at 156–57. By the time the Louisiana Supreme Court issued its ruling, however, the case had consumed nearly four years. See *id.* at 149; see also Original Complaint ¶¶ 130, 132.

The Krantzes, meanwhile, were not idle. During the pendency of LDRA's suit, Fair Grounds filed a letter with the Commission urging it to deny LDRA's application for a gaming license. This letter, the Plaintiffs contend, was rife with misrepresentations, such as that the Governor of Louisiana was himself opposed to LDRA's license application. Additionally, when LDRA requested a hearing before the Commission to discuss the OTB statutes and issued subpoenas for this hearing, Fair Grounds moved the Commission to quash the subpoenas and to postpone the hearing indefinitely. Any such hearing, Fair Grounds argued, should be delayed until LDRA's

lawsuit challenging the constitutionality of these statutes concluded. See Original Complaint ¶¶ 99–102.

The Commission granted LDRA a hearing on January 24, 1994.[6] The Plaintiffs, however, allege that this hearing was merely *pro forma*. LDRA avers that it was permitted neither to call its witnesses nor to present its full arguments. Rather, it was limited to a short period for argument and to reading into the record the questions it would have asked its witnesses. After the hearing, the Commission elected to take no action on the license application until LDRA's legal challenge to the statutes in question was finally resolved. See Original Complaint ¶¶ 103–106.

*The Revocation of LDRA's Racing License and Subsequent Litigation*

At its April 24, 1994, meeting, the Commission resolved to cancel LDRA's racing license. The chief justification for the revocation was that LDRA had not met its obligations as a primary licensee, which obligations included a duty to construct and operate a race track in Livingston Parish. The Plaintiffs contend, however, that the Commission was acting at the Krantzes' behest and that the revocation was aimed at depriving LDRA of standing in its lawsuit contesting the statute that denies OTB licenses to race tracks not in existence during the 1986–87 racing season.[7] See Original Complaint ¶¶ 107–08.

---

4. While LDRA's appeal was pending, it filed a second lawsuit challenging the validity of the statutes establishing limits for payouts on video poker machines. These statutes also favored race tracks in operation during or prior to the 1986–87 season by permitting them to make higher payouts than other facilities. This suit was consolidated with LDRA's already pending declaratory-judgment action. See *Livingston Downs*, 705 So.2d at 151; see also original complaint ¶¶ 128, 130.

5. The Louisiana Constitution permits a direct appeal to the Louisiana Supreme Court whenever a trial court deems an ordinance or law unconstitutional. See LA Const. art. 5. § 5(D) (West 1999).

6. At this time, LDRA's challenge to the state's OTB statutes was still pending. See *Livingston Downs*, 705 So.2d at 149.

7. The revocation of LDRA's racing license also prompted Odom to file, as part of his lawsuit challenging the referendum election

On April 29, 1994, LDRA filed suit in state court challenging the cancellation of its racing license. The Commission responded with a motion to dismiss LDRA's suit due to improper venue. Although the Commission was unsuccessful at both the trial and appellate levels, the Louisiana Supreme Court granted its motion and ordered LDRA's suit transferred to Orleans Parish. According to the Plaintiffs, the Commission's motion to dismiss was filed at the Krantzes' request and was designed solely to defeat or to delay LDRA's entry into the market for live horse racing. See *id.* ¶ 110, 113, 144.

On December 2, 1994, while LDRA's suit contesting the cancellation of its license was still pending, LDRA petitioned the Commission to reinstate the license. Citing the pendency of LDRA's lawsuit, the Commission declined to consider the petition. LDRA alleges that, owing to the Commission's refusal to reinstate its license, its lender withdrew the $10 million commitment to finance the proposed race track at Livingston Downs. See Original Complaint ¶¶ 136–37.

LDRA's suit contesting the revocation of its racing license culminated in a settlement agreement and the entry of a consent judgment in November 1996. See Def.'s Exh. C. Under the agreement, the Commission agreed to commute the revocation of LDRA's racing license to a two-year suspension and to give LDRA until October 31, 1998, to submit a new license application. See *id.* ¶ 3. The agreement specified that any such application must include a letter of commitment for $10 million in financial backing; it also provided that the Commission must approve of LDRA's proposed financier. See *id.* ¶¶ 6–7. The agreement contained a proviso allowing the Commission to declare the agreement void and to move to have the consent judgment dismissed if LDRA failed to submit an application by the deadline. See *id.*

LDRA requested an extension in which to file its application, which request the Commission denied. LDRA was nevertheless able to file a new application, complete with a letter of commitment for $10 million, one day before the deadline. On November 10, 1998, the Commission filed a motion to dismiss the consent judgment, arguing that Livingston Downs had failed to satisfy the terms and conditions of the agreement. See Def.'s Exh. E. Specifically, it argued that LDRA's commitment for financing was not a binding, enforceable commitment as the agreement required. It also argued that LDRA's financial commitment traduced La. R.S. § 4:147(4) because it conferred upon LDRA's financial backer, Remington Financial Group, the unfettered discretion to appoint owners of Livingston Downs. The Racing Commission also objected to the application because it was in the name of Livingston Downs Racing Association, L.L.C. rather than Livingston Downs Racing Association, Inc., the named plaintiff in the suit and consent judgment. The trial court ruled in favor of the Commission, and the Court of Appeal affirmed. See *Jefferson Downs Corp. v. Louisiana State Racing Comm'n,* 751 So.2d 465 (La.App. 4 Cir. 2000), writ denied, 2000–1067 (La.5/26/00, 762 So.2d 1112).

*Efforts to Influence the State Legislature and the Commission*

LDRA also asserts that its entry into the relevant market was obstructed by the Defendants' extensive lobbying of the state legislature and the Commission. With regard to the legislature, LDRA maintains that the Defendants were able to obtain

in Livingston Parish, a new motion urging that the election be declared a nullity. This motion was denied and Odom's suit later dismissed upon LDRA's motion. See *id.* ¶ 109.

changes in proposed legislation that hindered the Plaintiffs' competitiveness. LDRA refers to proposed amendments to state gaming laws that would have increased substantially the maximum payout for video poker devices located a race tracks. The Plaintiff aver that the Defendants directed Bankston, their attorney and the chairman of the legislative committee that oversees gambling in Louisiana, to modify the new legislation to limit the right to make higher video-poker payouts to only those race tracks in existence during the 1986–87 racing season.[8]

The Plaintiffs further maintain that the Defendants successfully lobbied the Commission to take numerous actions that ultimately defeated LDRA's entry into the market for live horse racing. As well as convincing the Commission to revoke LDRA's racing license and to oppose any efforts to reinstate the license, the Plaintiffs contend that the Defendants influenced the Commission to take the following anticompetitive steps: extending preferential treatment to other racetracks, including Jefferson Downs, Louisiana Downs, and Sawyer Downs; delaying LDRA's license application so as not to jeopardize the transfer of Jefferson Downs' OTB license to Fair Grounds; rejecting LDRA's application for an OTB license; fining LDRA over $200,000 for failing to hold races on the dates it was given; withholding the deposit on LDRA's license application; instituting harassing audits of LDRA's business records; and rejecting, *mala fide*, the new license application submitted by LDRA pursuant to the consent agreement. See generally Original Complaint ¶¶ 142–212.

## Federal Court Proceedings

The Plaintiffs filed this action on August 30, 1996. See Original Complaint. Named as defendants were Jefferson Downs; Fair Grounds; CCG and its officers; Bryan and Marie Krantz; Finish Line Management, Inc. (the company that operates the Krantzes' OTB parlors); Terrance Odom and Karen Thomas; Larry Bankston, in his official and personal capacities; and various members of the Commission. See *id.* ¶ 5. The original complaint asserted claims under the Sherman Antitrust Act, 15 U.S.C. § 1; various federal civil rights statutes, 42 U.S.C. §§ 1983, 1985, and 1986; and state law. See *id.* ¶ 1. The Plaintiffs later amended their complaint to assert civil claims under federal RICO statutes, see 18 U.S.C. §§ 1961–1968, against all defendants save the Commission. See First Supplemental and Amended Complaint ¶¶ 219, 233, 247 (doc. no. 69).

The Defendants variously moved, under Fed.R.Civ.P. 12(b)(6), for dismissal of all claims. See doc. nos. 12, 15, 38, 46. As the Plaintiffs had already dismissed the individual members of the Commission from the suit, the court granted the motion as to the claims under §§ 1983, 1985, and 1986. The court, however, declined to dismiss any of the other claims. See doc. no. 66. The Plaintiffs subsequently dismissed Defendants Terrance Odom and Karen Thompson from the action. See doc. nos. 249, 277.

The remaining Defendants filed an answer which invoked, as affirmative defenses, res judicata, statute of limitations, and the *Noerr–Pennington* and Parker doctrines. The Defendants have now moved for summary judgment on all remaining

---

**8.** This statute, which ultimately included such a restriction, was challenged by LDRA in one of its lawsuits. See supra note 4. The action was consolidated with LDRA's lawsuit con-

testing the statute which prohibited tracks not in existence during or prior to the 1986–87 season from conducting OTB operations. See *id.*

claims. See doc. nos. 295, 305. The Plaintiffs oppose.

Also pending before the Court is an unopposed motion by the Plaintiffs to withdraw selected factual representations from their first amended complaint. See doc. nos. 358–59. This brings to six the total number of motions pending before the Court in this matter.

### Summary Judgment Standard

The moving party is entitled to summary judgment when the pleadings, answers to interrogatories, admissions, and affidavits on file indicate no genuine issue as to any material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); see also Fed. R.Civ.P. 56(c). An issue is material if its resolution could affect the outcome of the action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

If the burden at trial rests on the non-movant, as it does here, the movant need do no more than demonstrate an absence of evidentiary support in the record for the non-movant's case. See *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. Although this Court considers the evidence in the light most favorable to the non-movant, the non-movant may not merely rely on allegations set forth in the pleadings. Instead, the non-movant must respond to the motion for summary judgment by designating particular facts indicating that there is a genuine issue for trial. See *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505. If, once the non-movant has been given the opportunity to raise a genuine factual issue, no reasonable juror could find for the non-movant, summary judgment will be granted. See *Celotex Corp.*, 477 U.S. at 322,

106 S.Ct. 2548; see also Fed.R.Civ.P. 56(c).

### Analysis

■ LDRA asserts that the Defendants violated federal antitrust and racketeering laws when they undertook to defeat or to delay substantially LDRA's efforts to enter the market for live horse racing in Louisiana. The Defendants contend that the *Noerr–Pennington* and *Parker* doctrines shield from antitrust liability their efforts to hinder, through litigation, campaigning, and lobbying, LDRA's entry into the relevant market.[9]

The Plaintiffs counter that the Defendants were not concerned with securing favorable Government action. Rather, their true goal was to entangle LDRA in such a quagmire of litigation and regulatory red tape that LDRA could not obtain financing for its proposed race track. As a result, LDRA argues, the "sham litigation" exception to *Noerr–Pennington* immunity applies, and summary judgment is inappropriate.

### I. Noerr–Pennington Doctrine

■ The Court begins with first principles. Section 1 of the Sherman Act prohibits "[e]very contract, combination ... or conspiracy" that unreasonably restrains interstate or foreign trade. See 15 U.S.C. § 1 (West 2000); *State Oil Co. v. Khan*, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) (the Sherman Act prohibits only unreasonable restraints on trade). In *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Supreme Court carved out an exemption to the antitrust laws for efforts by private

---

**9.** *Noerr–Pennington* immunity represents an affirmative defense. See *Acoustic Systems, Inc. v. Wenger Corp.*, 207 F.3d 287, 296 (5th Cir.2000). If not raised in the defendant's first responsive pleading, therefore, the de- fense will be waived. See *Lucas v. United States*, 807 F.2d 414, 417 (5th Cir.1986); see also Fed.R.Civ.P. 12(b). Because the defendants raised the defense in their answer, it is properly before the Court.

individuals to petition the Government for action that may have anticompetitive consequences. *Id.* at 136, 81 S.Ct. 523; see also *Mine Workers v. Pennington,* 381 U.S. 657, 669, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). This exemption, known as Noerr–Pennington immunity,[10] protects efforts to influence government officials regardless of the petitioner's anticompetitive motives or the efficacy of those efforts. See *Noerr,* 365 U.S. at 138, 143, 81 S.Ct. 523. The doctrine, moreover, encompasses attempts to influence legislative, executive, and administrative bodies, as well as efforts to obtain favorable court action through the filing of lawsuits. See *Noerr,* 365 U.S. at 136, 81 S.Ct. 523 (legislative action); *Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (administrative processes); *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510–11, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (state and federal agencies and courts). This broad application is mandated by the doctrine's roots in the First Amendment's guarantee of the right to petition the Government for redress. See *Noerr,* 365 U.S. at 138, 81 S.Ct. 523, see also *California Motor,* 404 U.S. at 510–11, 92 S.Ct. 609.

■ The *Noerr–Pennington* doctrine admits of one exception: it does not shield petitioning activity that is "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." See *Noerr,* 365 U.S. at 144, 81 S.Ct. 523. Under this sham exception, if the petitioner seeks "to use the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon," the petitioning activity will not be protected from antitrust liability. *Columbia v. Omni Outdoor Adver., Inc.,* 499 U.S. 365,

380, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). The sham exception governs situations in which the petitioner's "activities are not genuinely aimed at procuring favorable governmental action." See *Allied Tube & Conduit Corp.,* 486 U.S. 492, 500 n. 4, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988) (internal citation omitted). The absence of a genuine desire for governmental action may be evidenced by "a pattern of baseless, repetitive claims" indicating that "the administrative and judicial processes have been abused." See *California Motor,* 404 U.S. at 513, 92 S.Ct. 609 (internal citation and quotation marks omitted).

■ The Supreme Court recently clarified and narrowed the scope of the sham exception as it relates to the adjudicatory process. In *Professional Real Estate Investors, Inc. v. Columbia Pictures Ind.,* 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993), the Court promulgated a sequential, two-step inquiry that obtains when an antitrust defendant is accused of instituting sham litigation. Under this regime, the plaintiff must first establish that the litigation was "objectively baseless." A suit is objectively baseless when "no reasonable litigant could realistically expect success on the merits." See *id.* at 60, 113 S.Ct. 1920. To prevail, however, the plaintiff must also demonstrate that the contested litigation was nothing more than "an attempt to interfere directly with the business relationships of a competitor." *Id.* The Court emphasized that the two parts of this test operate in succession: only if a suit is found to be objectively baseless does the reviewing court proceed to examine the defendant's subjective intent in bringing the suit. See *id.* Under this test, then, successful litigation can

---

**10.** Referring to the *Noerr–Pennington* doctrine as an antitrust immunity is somewhat of a misnomer, for the doctrine provides only a defense to liability, not immunity from suit.

*See Acoustic Sys., Inc. v. Wenger Corp.,* 207 F.3d 287, 295 (5th Cir.2000). Because it is often referred to as an immunity, however, the Court will refer to it as such as well.

never be deemed sham, even when it is animated by an anticompetitive intent. See *id.* n. 5, 113 S.Ct. 1920.

Although the *Noerr–Pennington* doctrine applies to activities directed at any branch of government, the Supreme Court has indicated that its scope "depends ... on the source, context, and nature of the anticompetitive restraint at issue." *Allied Tube*, 486 U.S. at 499, 108 S.Ct. 1931. Hence, the doctrine may enjoy a broader reach in the legislative arena vis-à-vis the courtroom or an administrative hearing. See *id.;* see also *California Motor*, 404 U.S. at 513, 92 S.Ct. 609. Given that LDRA's allegations involve petitioning activity in all three forums, the Court will examine each independently.

## 1. Political Activities

### A. Lobbying the Legislature

■ LDRA asserts that the Defendants successfully lobbied the Louisiana Legislature to alter proposed legislation to LDRA's detriment. By denying LDRA the right to make larger payouts on video poker devices, LDRA contends, the Defendants directly impaired LDRA's ability to enter the market for live horse racing.

This claim is without merit, for the Defendants' attempt to obtain legislation inimical to LDRA's interests is precisely the sort of petitioning activity *Noerr–Pennington* immunity was designed to protect. See *Noerr*, 365 U.S. at 135, 81 S.Ct. 523 ("no violation of the [Sherman] Act can be predicated on mere attempts to influence the passage ... of laws."). The plainly anticompetitive goal that underlay the Defendants' actions does not alter this conclusion. Nor does the efficacy of the Defendants' lobbying efforts or the degree of actual harm suffered by LDRA. See *id.* at 139–40, 81 S.Ct. 523 ("it is not ... illegal for people to seek action on laws in the hope that they may bring about ... a disadvantage to their competitors.").

Antitrust liability would be warranted only if LDRA asserted that the Defendants did not genuinely seek the legislation they argued for and sought simply to delay or defeat LDRA's entry through the lobbying process itself. See *Omni Outdoor Adver.*, 499 U.S. at 381, 111 S.Ct. 1344. LDRA makes no such claim as, indeed, it cannot. The Defendants clearly desired the governmental action they advocated: denying the competitive advantage of higher video-poker payouts to any would-be rivals.

### B. Campaigning in the Referendum Election

■ LDRA likewise complains that the Defendants ran afoul of the Sherman Act when they formed CCG and mounted a publicity campaign against LDRA in the referendum election. LDRA contends that the Defendants used deceptive tactics in order to mislead the public. These tactics included forming and surreptitiously funding CCG to make it appear that the views expressed during the campaign were those of independent persons and groups. These clandestine tactics, LDRA contends, deprived the Defendants' activities of legitimacy.

This argument is likewise foreclosed by *Noerr* In that case, the Supreme Court concluded that political activities such as publicity campaigns are beyond the remit of the antitrust laws even when the defendants resort to "unethical tactics" during the campaign. See *Noerr*, 365 U.S. at 140–41, 81 S.Ct. 523 (noting that it is inapposite for purposes of antitrust liability that the defendants used unethical tactics in a publicity campaign because the antitrust statutes do not regulate political activities). The Defendants' efforts to sway public sentiment against the proposed race track are plainly within the scope of *Noerr–Pennington* immunity. This re-

mains true even if, as the Plaintiffs allege, the Defendants used misleading or underhanded methods. See *id.*

LDRA nevertheless directs the Court's attention to the following statement in Noerr: "[t]here may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." See *id.* at 144, 81 S.Ct. 523. LDRA pointedly asserts that, during the campaign, the Defendants' repeatedly emphasized the vices of live horse racing and gambling. These manifestly hypocritical arguments, LDRA asserts, signify precisely the sort of bad faith publicity campaign that incurred the Noerr Court's opprobrium.

LDRA's argument is tempting, but it is wrong. It is undisputed that the Defendants genuinely desired the governmental action for which they campaigned: to deny LDRA the public support necessary to establish a competing race track. See *Noerr*, 365 U.S. at 144, 81 S.Ct. 523 (noting that the defendant's genuine effort to influence legislation and law enforcement shielded its campaign tactics). The publicity campaign at issue is thus distinguishable from one in which a defendant attempts to interfere with a competitor's business relationships by, for example, falsely besmirching that competitor's reputation or competence. It is toward this latter sort of campaign that the above quotation from *Noerr* is addressed. See *id.* at 142, 81 S.Ct. 523 (holding that the defendants were immune because they never "attempted directly to persuade anyone not to deal with [the plaintiffs]."). Heavy irony may inhere in the Defendants' campaign tactics, but this does not deprive the Defendants of their First Amendment guarantees.

LDRA also urges that efforts to influence the public, rather than government officials, are beyond the pale of the *Noerr–Pennington* doctrine. This argument is unpersuasive. The ultimate goal of CCG's campaigning was to cause the government to disallow LDRA's entry into the market for live horse racing. This was to be accomplished, albeit indirectly, by denying LDRA the voters' approval. Such indirect efforts to influence government officials are undeniably protected by *Noerr–Pennington.* See *Allied Tube*, 486 U.S. at 499–500, 108 S.Ct. 1931 ("*[a] publicity campaign directed at the general public, seeking legislation or executive action, enjoys antitrust immunity ....*" (internal citation and quotation marks omitted)(emphasis added)). Any argument that the defendants violated the Sherman Act by misleading the public during the referendum is therefore unavailing.

**2. Administrative Hearings**

■ A closer question is posed by the Defendants' efforts to influence the Commission. It is clear that *Noerr–Pennington* immunity extends to efforts to influence all branches of government, including state administrative agencies. See *California Motor Transp.*, 404 U.S. at 510–11, 92 S.Ct. 609. As noted, however, the Supreme Court has intimated that the scope of the sham exception varies depending upon the branch of government involved. See *id.* at 513, 92 S.Ct. 609. In the legislative or political arenas, the Court has explained, *Noerr–Pennington* immunity enjoys its broadest sweep, and the sham exception is at its nadir. Hence, even "misrepresentations and other forms of unethical conduct" will not incur antitrust liability when directed toward lawmakers. See *id.* at 513, 92 S.Ct. 609. But when a court of law is the object of the challenged petitioning, the sham exception is given a much broader compass. Thus, unethical

or illegal conduct that would be condoned in the political context is proscribed when it is used to inveigle an adjudicatory tribunal. See *id.* see also *Allied Tube,* 486 U.S. at 499–500, 108 S.Ct. 1931. Similarly, the Supreme Court has suggested, *in dicta,* that *Noerr* immunity is inapplicable when the defendant is accused of seeking, not to influence judicial decisionmaking, but rather "to bar their competitors from meaningful access to adjudicatory tribunals and so to usurp that decisionmaking process." See *California Motor,* 404 U.S. at 515, 92 S.Ct. 609.

In *Bayou Fleet, Inc. v. Alexander,* 234 F.3d 852 (5th Cir.2000), the Fifth Circuit confronted a claim of sham petitioning before a local zoning board and the parish council. *Id.* at 862. The defendants, it was alleged, had lobbied the zoning board to review the plaintiff's zoning permit; had persuaded the parish council to write a letter to the Army Corps of Engineers opposing the plaintiffs' request for dredging permits; and had persuaded the parish council to adopt laws harmful to the plaintiffs' business interests. The Fifth Circuit adverted to the two-tiered test of *Professional Real Estate Investors* and began its inquiry by examining the objective reasonableness of the defendants' lobbying efforts. Noting the success of each of these efforts, the court concluded that the defendants' actions were objectively reasonable and ended its inquiry. See *id.*

The Defendants herein urge the Court to follow the approach outlined in *Bayou Fleet* and to conclude that the efficacy of their efforts to lobby the Commission insulates them from further inquiry. But the applicability of *Bayou Fleet* to the instant case is uncertain. The parish council in *Bayou Fleet* was unquestionably a political

entity. And, given that the *Bayou Fleet* court did not distinguish between the parish council and the zoning commission in undertaking its *Noerr–Pennington* analysis, it is clear that the Bayou Fleet court considered the latter entity to be a political one, as well. Because both of the governmental entities in *Bayou Fleet* were political bodies, *Noerr–Pennington* immunity enjoyed its broadest reach in that case. See *California Motor,* 404 U.S. at 513, 92 S.Ct. 609. Furthermore, the complaint in *Bayou Fleet* contained no allegations of unethical conduct or misrepresentation. LDRA, by contrast, asserts that the Defendants made misrepresentations to the Commission and attempted to deny it meaningful access thereto. These allegations of misrepresentation would warrant a more searching inquiry if the Commission were deemed an adjudicatory body. See *California Motor,* 404 U.S. at 512–13, 515, 92 S.Ct. 609 (noting that misrepresentations are not immunized when used in the adjudicatory process and that efforts to deny a party access to an adjudicatory tribunal may result in antitrust liability).

As a necessary prologue to any *Noerr–Pennington* immunity analysis, therefore, the Court must determine whether the Commission, an executive agency,[11] is more akin to a political entity or to a judicial body. Such a distinction is a difficult one to draw, for, as the Ninth Circuit has observed, "the executive branch is radically diverse," encompassing everything from administrative bodies that hold formal hearings and are bound by regulations to entities that are "unapologetically political." See *Kottle v. Northwest Kidney Ctrs.,* 146 F.3d 1056, 1061 (9th Cir.1998). The Fifth Circuit has articulated no test for discerning when an administrative

---

11. The statute creating the Commission expressly denotes the agency as a component of the executive branch. See La.Rev.Stat. Ann. § 4:144 (West Supp.2001) ("There is hereby created *in the executive branch* of state government a racing commission, to be known as the 'Louisiana State Racing Commission.'" (emphasis added)).

agency is acting as an adjudicatory body, and no clear guidelines have emerged from the other circuits. The court that has rendered this issue the most thorough treatment, the Ninth Circuit, has eschewed a bright-line test in favor of a totality-of-the-circumstances approach. See *id.* at 1062.

In *Kottle,* the Ninth Circuit determined that a state health department was acting as an adjudicatory body when it denied the plaintiff's request for a permit to build a kidney dialysis center. See *id.* at 1062. In so concluding, the Ninth Circuit observed that the permit process bore many of the indicia of an adjudicatory proceeding. The department, for example, conducted public hearings, accepted written and oral arguments, permitted parties to be represented by counsel, and allowed affected parties to question witnesses. The department was required to issue a written ruling, the court further noted, and that ruling was appealable. The appeal, moreover, was governed both by the Administrative Procedures Act and state statutory standards. As a result, the Ninth Circuit concluded that department's discretion was sufficiently limited as to justify application of the judicial variant of the sham exception. See *id.*

The Court concludes that the Committee's discretion was adequately circumscribed that it should be regarded as an adjudicatory body for purposes of the sham exception. The Commission is governed both by Louisiana's Administrative Procedures Act [12] and the Open Meeting Law.[13] See *Jefferson Downs,* 751 So.2d at 468. Accordingly, the Commission was required not only to hold public hearings to consider LDRA's various license applications, but also to permit LDRA to present arguments and witnesses at such hearings and to be represented by counsel. Moreover, Louisiana's racing statutes enumerate several criteria the Commission was obligated to weigh in evaluating LDRA's license applications. See La.Rev.Stat. Ann. §§ 4:159,:214. Those statutes also limit the Commission's authority to revoke a racing license, permitting such action only for just cause. See La.Rev.Stat. Ann. § 4:160. LDRA further had a statutory right to judicial review of the Committee's decisions to deny and to revoke its licenses. See La.Rev.Stat. Ann. § 4:158. Insofar as the LDRA's license applications are concerned, therefore, the broader sham exception that obtains in the context of judicial proceedings is applicable.[14]

---

**12.** See La.Rev.Stat. Ann. § 49:950 *et seq.* (APA)

**13.** See La.Rev.Stat. Ann. § 42:4.1 *et seq.* (Open Meeting Law).

**14.** The Ninth Circuit has held that the sham exception applies to petitioning efforts directed toward executive entities only to the extent that "[the executive entity's] actions are guided by enforceable standards subject to review." *Manistee Town Ctr. v. City of Glendale,* 227 F.3d 1090, 1094 (9th Cir.2000) (internal citation and quotation omitted). The Court finds this rationale persuasive, for petitions which do not involve the individualized application of established principles cannot be reviewed for objective merit, as required under *Professional Real Estate Investors.* See

*id.* Given that several of the Commission's decisions were appealed to the state courts, it is clear that these decisions, at least, were subject to review. Hence, the sham exception is applicable to these petitions, even under the more rigorous approach of *Manistee Town Center.* Although it is uncertain whether all the Commission's decisions were guided by established rules and were subject to review, absent any evidence or argument to the contrary, the Court will presume, without finding, that they were. See *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505 (on summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party). Hence, the Court finds the sham exception available as to all of LDRA's claims of sham petitioning before the Commission.

A common thread running through the *corpus juris* of the *Noerr–Pennington* doctrine is that, to qualify for protection, the defendant must employ ethical and legitimate means when petitioning an adjudicatory tribunal for relief. See, e.g., *California Motor*, 404 U.S. at 513, 92 S.Ct. 609; see also *Allied Tube*, 486 U.S. at 499–500, 108 S.Ct. 1931; *Woods Exploration & Producing Co. v. ALCOA*, 438 F.2d 1286, 1296–98 (5th Cir.1971). The Defendants note, however, that the Supreme Court's holding in *Professional Real Estate Investors* has led some courts to question the continued validity of this "fraud exception" to *Noerr–Pennington* immunity. See *Baltimore Scrap Corp. v. David Joseph Co.*, 237 F.3d 394, 401–02 (4th Cir.2001) (suggesting that, although the Court expressly pretermitted this question, the holding in *Professional Real Estate Investors* signals the Court's skepticism about the existence of such an exception); see also *Professional Real Estate Investors*, 508 U.S. at 61 n. 6, 113 S.Ct. 1929 ("[w]e need not decide here whether and, if so, to what extent *Noerr* permits the imposition of antitrust liability for a litigant's fraud or other misrepresentations."). The Defendants further observe that those courts which do continue to recognize the fraud exception to *Noerr–Pennington* immunity have limited the exception to situations in which the fraud was so pervasive as to deprive the adjudicatory proceedings of all legitimacy. See, e.g., *Baltimore Scrap*, 237 F.3d at 401–02; *Cheminor Drugs v. Ethyl Corp.*, 168 F.3d 119, 123–24 (3d Cir.1999); *Liberty Lake Inv. v. Magnuson*, 12 F.3d 155, 157–59 (9th Cir.1993).

Absent a more direct statement from the Supreme Court that the "fraud exception" to *Noerr–Pennington* immunity is no longer viable, the Court will presume that it remains intact. LDRA's pleadings contain assertions of fraud and denial of access to regulatory agencies. LDRA contends, for instance, that the Defendants submitted a letter to the Commission which represented, falsely, that the Governor of Louisiana opposed LDRA's racing license. Furthermore, LDRA alleges that the Defendants curtailed its access to the Commission by inducing the Commission to take the following steps: delay consideration of LDRA's racing-license until after Jefferson Downs had successfully transferred its OTB license to Fair Grounds; quash subpoenas LDRA had issued for a hearing before the Commission; and deny LDRA the opportunity to present witnesses or arguments in support of its bid for an OTB license. LDRA argues that the sole aim of these exclusionary tactics was to hinder LDRA's efforts to obtain redress from the Commission.

The record, as it currently stands, fails to raise a genuine issue with regard to LDRA's claims of fraud. LDRA has adduced no evidence to substantiate its contention that the Defendants made misrepresentations to the Commission. See *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 521 (5th Cir.1999) (to avoid summary judgment, the nonmoving party must produce or identify in the record evidence sufficient to sustain a finding in its favor respecting those facts as to which it bears the burden of proof). The letter containing the supposed misrepresentations is not included in the record,[15] and, with one exception, LDRA has failed even to allege what untruths the letter contained. See *Kottle*, 146 F.3d at 1063–64 (holding that the plaintiff's failure to specify the misrepresentations allegedly made

---

**15.** LDRA asserts in its complaint that the Commission refused to produce the letter prior to the hearing on LDRA's OTB license. See Original Complaint ¶ 102. Yet LDRA offers no explanation for its failure to obtain the letter through discovery, nor has it requested additional time to do so.

536

by the defendant before the state licensing agency precluded it from invoking the sham exception). As for the assertion that the letter falsely indicated that the Governor opposed LDRA's license, LDRA has not shown that this assertion, which was not even set forth in an affidavit, was material to the Commission's decision or that this assertion so tainted the proceedings as to deprive them of all legitimacy. See *Baltimore Scrap*, 237 F.3d at 401–02; *Cheminor*, 168 F.3d at 123–24. LDRA was free to object to the Defendant's supposed misrepresentations and to rebut them with facts of their own. See *Armstrong Surgical Ctr., Inc. v. Armstrong Cty. Mem'l Hosp.*, 185 F.3d 154 (3d Cir. 1999) (holding that the defendant was entitled to *Noerr–Pennington* immunity because the plaintiff had ample opportunity to correct the misrepresentations made to the state licensing board).

Less certain is whether LDRA has raised a genuine issue with regard to its contention that it was denied meaningful access to the Commission. LDRA asserts that, although it was afforded a hearing on its second application for a racing license, this hearing was itself a sham. LDRA alleges that the Defendants used their influence with the Commission to delay the hearing on LDRA's application. LDRA also asserts that, when the application was finally heard, the Commission quashed its subpoenas, prohibited it from calling its witnesses, and refused to allow LDRA to present its arguments fully, all at the Defendants' behest. These assertions, if believed, could lead a reasonable factfinder to conclude that the Defendants were using their "power, strategy, and resources ... to harass and deter [LDRA] in its use of administrative ... proceedings so as to deny [it] free and unlimited access" to the Commission. See *California Motor*, 404 U.S. at 511, 92 S.Ct. 609. As a result, genuine issues of fact remain as to whether "the machinery of [the Commis-

sion] was effectively closed" to LDRA and whether that the Defendants usurped the Commission's decision-making authority. See *id.* Summary judgment on this claim is therefore inappropriate.

Moreover, it is clear that, in certain respects, the Commission was acting as an executive body as opposed to an adjudicatory one. For example, the Commission, pursuant to its role as the agency responsible for enforcing gaming statutes, initially revoked LDRA's racing license because it had failed to hold races during the required period. The Commission, also in its enforcement capacity, cancelled the race dates LDRA was later granted; rejected the license application LDRA submitted pursuant to the consent judgment because of supposed inadequacies; withheld LDRA's application fees; audited LDRA's financial and business records; and extended preferential treatment to other race tracks. Even if the Commission took all these actions at the Defendants' bidding as LDRA claims, however, LDRA cannot prevail. The Commission was acting in an executive or enforcement capacity when it took these actions, and hence the *Noerr–Pennington* doctrine was at its broadest reach. See *California Motor*, 404 U.S. at 510, 92 S.Ct. 609 (noting that *Noerr* precludes any cause of action for efforts to influence the Executive Branch for the enforcement of laws). Furthermore, the efficacy of the Defendants' efforts to persuade the Commission to take these various steps renders them immune from antitrust liability. See *Bayou Fleet*, 234 F.3d at 862 (noting that the successful nature of the defendants' efforts to influence the parish counsel and zoning board shielded them from antitrust liability).

LDRA's allegations further imply that various members of the Commission colluded with the Defendants to prevent LDRA from obtaining the racing and OTB

licenses necessary to enter the relevant market. These claims, even if true, would not deprive the Defendants of their immunity under *Noerr–Pennington,* however, for the Supreme Court has emphatically rejected the notion that there is a conspiracy exception to this doctrine.[16] See *Omni,* 499 U.S. at 374, 383–84, 111 S.Ct. 1344 (also denying the existence of such an exception to state-action or *Parker* immunity). Thus, even if the Defendants did conspire with the members of the Commission to delay or otherwise hinder LDRA's license applications, the Defendants would nevertheless be entitled to summary judgment.

### 3. Litigation

 LDRA also asserts that the Defendants repeatedly engaged in sham litigation in the state courts in an effort to prevent or delay its entry into the market for live horse racing and gambling. The Defendants urge the Court to apply the sequential analysis outlined in *Professional Real Estate Investors* to this claim and to conclude that, inasmuch as LDRA cannot prove that each of the challenged suits was objectively meritless, they are entitled to *Noerr–Pennington* immunity. LDRA, on the other hand, maintains that the test set out in *Professional Real Estate Investors* is inapplicable when, as here, the defendants are alleged to have instituted a whole series of vexatious legal proceedings. In this latter context, LDRA asserts, the analysis set forth in *California Motor* still obtains and the inquiry begins with an assessment of the defendant's intent in bringing the various lawsuits. See Plaintiff's Memorandum in Opposition to Summary Judgment, 35–40.

 Whether the two-tiered regime announced in *Professional Real Estate In-*

*vestors* governs when the antitrust defendant is alleged to have filed a series of predatory lawsuits is a question of first impression in this circuit. The two circuits to have addressed the issue, however, have both concluded that it does not. See *USS–POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades Council,* 31 F.3d 800, 810–811 (9th Cir.1994); *Primetime 24 Joint Venture v. National Broadcasting Co.,* 219 F.3d 92, 101 (2d Cir.2000). These courts have construed *Professional Real Estate Investors* narrowly, reasoning that its two-tiered analysis applies only when assessing whether a *single* lawsuit constitutes sham petitioning. See, e.g., *USS–POSCO,* 31 F.3d at 810–11 (observing that *Professional Real Estate Investors* involved only a single patent-infringement lawsuit); *Primetime 24,* 219 F.3d at 101.

When a series of lawsuits is at issue, the Ninth and Second Circuits continue to adhere to the framework outlined in *California Motor,* where the Supreme Court began its analysis by examining the defendant's intent in filing the lawsuits. See *USS–POSCO,* 31 F.3d at 810 (noting that *Professional Real Estate Investors* did not overrule *California Motor* but instead expressly approved its holding); see also *California Motor,* 404 U.S at 512, 92 S.Ct. 609. This disparate approach is necessary, these courts have posited, because the filing of a series of frivolous lawsuits signifies a form of anticompetitive conduct that differs not merely in degree, but also in kind, from the filing of a single, baseless action. See, e.g., *USS–POSCO,* 31 F.3d at 811 ("the filing of a whole series of lawsuits . . . without regard to the merits has far more serious implications than filing a single action. . . ."). The approach also comports with the distinction alluded

---

**16.** The Supreme Court has intimated that the exception for conspiracies may remain viable when the Government is a market participant.

See *Omni,* 499 U.S. at 379, 111 S.Ct. 1344. LDRA does not make such an assertion, and the record clearly does not support one.

to by the Supreme Court in *Professional Real Estate Investors*, where the Court explained that, in determining whether the sham exception is implicated, "a reviewing court [must] discern [ ] and draw[ ] the difficult line separating objectively reasonable claims from a pattern of baseless, repetitive claims ... which leads the factfinder to conclude that the administrative and judicial processes have been abused." See *Professional Real Estate Investors*, 508 U.S. at 58, 113 S.Ct. 1920 (internal citation and quotation marks omitted).

Under this approach, the pertinent question is not whether any one of the lawsuits has merit, but whether they were brought pursuant to a policy of instituting legal proceedings without regard to the merits and for the purpose of injuring a market rival. Or, as the Ninth Circuit phrased it, the court must ask, "[w]ere the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment." See *id.;* see also *Primetime 24*, 219 F.3d at 101. Because the focus of the inquiry is the defendant's intent in filing the lawsuits, it is irrelevant in this context that some of the suits prove not to be frivolous. This may be the case "just as a matter of chance." See *USS–POSCO*, 31 F.3d at 811 (quipping that "even a broken clock is right twice a day.").[17] In-

stead, the test is entirely prospective, and the plaintiff can survive summary judgment by merely establishing a pattern of repetitive claims that were filed without regard to their merits. See *id.;* see also *California Motor Transp.*, 404 U.S. at 510–11, 92 S.Ct. 609. LDRA invites the Court to adopt this approach in evaluating its allegations of sham litigation.

The Court is persuaded that the test enunciated in *USS–POSCO* is more apposite to this case. LDRA alleges not only that the Defendants filed a series of predatory lawsuits but also that they filed repetitive and groundless claims. Both of these characteristics distinguish LDRA's claims from the single lawsuit at issue in *Professional Real Estate Investors*. LDRA's allegations of collateral harm also militate against applying the *Professional Real Estate Investors* test to the instant case. As Justice Stevens noted in his concurrence in *Professional Real Estate Investors*, the anticompetitive harm alleged in that case was defined by and limited to the prayer of relief in the underlying action. See *Professional Real Estate Investors*, 508 U.S. at 70, 113 S.Ct. 1920. Here, by contrast, LDRA has alleged that the Defendants filed and intervened in lawsuits, in part, to vitiate its ability to obtain financing. This assertion of an intent to inflict harm "external to the litigation or to the result reached in the litigation" warrants a more searching inquiry of the Defendants' mo-

---

**17.** The Court notes an apparent logical inconsistency in the *POSCO* holding. The *POSCO* court asserts that its test is prospective and that, in the multiple-suit context, the outcome of the contested lawsuits is inapposite. Yet the *POSCO* court begins its analysis by examining the outcomes of the challenged suits and reasoning that, because more than half of them were successful, they could not be shams. See *USS–POSCO*, 31 F.3d at 811. By turning first to the outcomes of the challenged lawsuits, the *POSCO* court would seem to have controverted its own "prospective" approach. This inconsistency, however, is reconcilable with the *POSCO* court's stated rationale. The *POSCO* court relied upon the outcomes of the challenged lawsuits merely as circumstantial evidence of the defendants' intent in filing them. In effect, the *POSCO* court inferred that, inasmuch as most of the suits had merit, the defendants' purpose in filing them was not to delay or harass the plaintiff, but rather was to achieve a favorable ruling. Moreover, that more than 50% of the cases turned out to have merit informs the question whether the suits were filed automatically, without regard to the merits.

tives in participating in the challenged litigation. See *id.*

An antecedent question to the application of the *California Motor Transport* test, however, is whether a sufficient number of suits are at issue to justify deviating from the sequential analysis of *Professional Real Estate Investors.* No court has delimited the number of lawsuits necessary to trigger the prospective test of *California Motor.* Twenty-nine lawsuits were at issue in *USS–POSCO*, and the opinion in *Primetime 24* alludes to "huge volumes of challenges" that were raised simultaneously. See *Primetime 24*, 219 F.3d at 101. Here, there are approximately nine lawsuits at issue, only four of which were instituted by the Defendants themselves.[18] The remainder were suits in which the Defendants intervened or which the Commission purportedly undertook at the Defendants' behest. The Court will presume that these latter suits can amount to sham litigation for purposes of *Noerr.*[19] The Court finds this number of actions suffi-cient to invoke the *USS–POSCO* variant of the sham-litigation analysis.

In *California Motor,* the Supreme Court explained that the ultimate question in ascertaining the applicability of the sham exception is whether the plaintiff has alleged "a pattern of baseless, repetitive claims [sufficient to lead] a factfinder to conclude that the administrative and judicial processes have been abused." *California Motor,* 404 U.S. at 513, 92 S.Ct. 609. Such a showing can be achieved through evidence that the Defendant filed the lawsuits "with or without probable cause, and regardless of the merits of the cases." See *id.* at 512, 92 S.Ct. 609. Accordingly, the Court will examine the lawsuits in an effort to discern whether, as a whole, they signify a pattern of frivolous claims that were initiated with no regard for the merits.

Clearly, those suits in which the Defendants prevailed do not support a finding that the judicial process was abused.[20]

---

18. There are, in addition, two suits filed by the Plaintiff against the Defendants. See *LDRA v. Committee to Control Gambling, Inc.,* No. 67,822 (Livingston Parish) and *LDRA v. Bryan Krantz,* No. 68,605 (Livingston Parish). Although the Fifth Circuit has suggested that defending a lawsuit can fall within the sham exception if the defendant does not honestly desire to affect the outcome of the case, see *In re Burlington,* 822 F.2d at 532–33, the continued validity of that position is highly suspect in the wake of *Professional Real Estate Investors.*

19. The Court is mindful of the significant distinction between initiating a lawsuit and merely intervening in a lawsuit that has already been filed. Cf. *Falise v. American Tobacco Co.,* 94 F.Supp.2d 316, 351 (E.D.N.Y. 2000). The former behavior poses a far greater opportunity for the defendant to impose economic injury upon a rival. This is because, in the latter instance, the rival has already undertaken the costs and risks that attend litigation. Yet if the key to the application the sham exception is the abuse of the adjudicatory process, as the Supreme Court has suggested, see *California Motor,* 404 U.S. at 513, 92 S.Ct. 609, then there remains a palpable risk that parties, though only intervenors, can pervert the machinery of the courts to harass rivals who are already there. This case illustrates how such abuse might be carried out. The Defendant here unsuccessfully appealed unfavorable rulings in other cases, thereby prolonging the litigation well beyond its normal terminus.

20. By the Court's reckoning, the successful suits include: (1) the suit seeking a stay of the Commission's decision to grant LDRA a racing license; (2) LDRA's suit, in which Defendants intervened, challenging the legitimacy of the state's racing-license statute; and (3) LDRA's suit, in which Defendants also intervened, contesting the validity of the state's video-poker statute. LDRA avers that the Defendants should be held responsible for the Commission's vigorous defense of LDRA's suit, filed on April 29, 1994, challenging the Commission's decision to revoke LDRA's racing license. Even assuming that the Defen-

Yet there is some evidence that the Defendants engaged in repetitive litigation. For example, the Defendants, through Karen Thomas, intervened in an action initiated by LDRA in which LDRA sought to compel the Secretary of State to hold the referendum election in Livingston Parish.[21] The Defendants argued that procedural irregularities in noticing the election precluded its being held. Notwithstanding this intervention, the Defendants, through Terrence Odom, filed a separate lawsuit seeking to enjoin the Secretary from holding the election. This action was based on the same grounds as the Defendants' intervention.[22] Moreover, when LDRA prevailed and the election went ahead, the Defendants challenged the election's legitimacy. This action was also based on supposed procedural irregularities in noticing the election. Clearly, the Defendants pursued the same claim on several occasions.

There is also some evidence that the Defendants abused the judicial process. After their request for an injunction to stop the election was denied, the Defendants unavailingly appealed to the Louisiana Supreme Court. Though rebuffed there, the Defendants maintained the suit for nearly two years, until, the election long over, it was dismissed as moot. Additionally, there is evidence suggesting that the Defendants attempted to delay adjudication of their own lawsuits. For example, in the election challenge filed by Odom, the Defendants attempted to stay discovery and to prevent Odom's and Thomas's depositions. The Defendants also intervened in LDRA's April 1993 action seeking to compel the Commission to hold a hearing to consider its application for racing dates. Upon being admitted to that action, the Defendants' attorney, Bankston, attempted to stay the suit until the end of the legislative session.

The Defendants' apparent temporizing, coupled with their seemingly overzealous pursuit of certain actions, gives rise to an inference that they were attempting to "use [the litigation] process—as opposed to the outcome of that process—as an anticompetitive weapon." See *Omni*, 499 U.S. at 380, 111 S.Ct. 1344; but see *St. Joseph's Hosp. v. Hospital Corp. of Am.*, 795 F.2d 948, 955 (11th Cir.1986) (noting that the defendants were entitled to use every available means to delay the issuance of the plaintiff's license). This inference is confirmed by two complementary factors: (1) the insubstantial nature of the election challenge reiterated by the Defendants; and (2) the evidence that the Defendants were aware of the pejorative effects any

dants can be charged with this suit and that mere defense of a lawsuit can constitute sham litigation, that action culminated in a consent judgment. Given that outcome, it is difficult to conclude that the Defendants' position in that dispute was baseless.

**21.** LDRA makes much of the fact that the Defendants solicited "straw plaintiffs" in order to obtain standing to file its lawsuits. It is true that the Fifth Circuit held in *Burlington Northern* that individuals who lack standing to bring suit in their own right are not entitled to *Noerr* immunity. See *Burlington Northern*, 822 F.2d at 531. The few courts to consider the question in the wake of *Professional Real Estate Investors*, however, have found the presence of straw plaintiffs not to be germane when assessing the applicability of the sham exception. See *Baltimore Scrap*, 237 F.3d at 401; see also *Liberty Lake Investments, Inc. v. Magnuson*, 12 F.3d 155, 157–59 (9th Cir.1993). The Court sees no reason to deny outright *Noerr* immunity to those who lack standing in a particular action. Nevertheless, the fact that straw plaintiffs were used can be instructive as to whether the contested litigation was instituted in genuine hope of obtaining relief or merely in an effort to harass a business competitor. Because the Court is applying the prospective analysis of *California Motor* in this case, it will consider the evidence of straw plaintiffs for this limited purpose.

**22.** These actions were consolidated at trial.

pending lawsuit would have upon LDRA's ability to obtain the requisite financing.

Given that the state courts uniformly rejected the Defendants' argument that the referendum had been improperly noticed, the Defendants' dogged pursuit of that claim cannot easily be reconciled with a genuine desire to obtain judicial relief. The Defendants continued to press the Thomas suit, which sought injunctive relief, until well after the election concluded. The same is true of the Odom election contest, which was pursued for years after the election was held. The Defendants' persistence with regard to claims that were manifestly tenuous suggests that the Defendants sought merely to keep the lawsuits pending as long as possible. This inference, when coupled with LDRA's evidence that the Defendants were aware that a pending lawsuit could scuttle LDRA's efforts to obtain financing, see Plntff's Exh. 12, could lead a reasonable factfinder to conclude that the Defendants sought not to obtain judicial relief but rather to hamper LDRA with the litigatory process itself.

The assertion that the Defendants sought to inflict injury collateral to the lawsuits themselves renders summary judgment is inappropriate on LDRA's sham-litigation claims. See *Westmac, Inc. v. Smith*, 797 F.2d 313 (6th Cir.1986) (indicating that evidence suggesting that the challenged lawsuits, though not frivolous, were instigated in order to prevent the plaintiff from obtaining financing was sufficient to rebut the presumption that the defendants were immune).

In sum, the Court concludes that the Defendants are entitled to summary judgment on LDRA's claim that they violated the Sherman Act by lobbying the Louisiana Legislature and by engaging in a publicity campaign to defeat the referendum. The Court further concludes, however, that the Defendants are not entitled to summary judgment on LDRA's claims that the Defendants' sham petitioning denied them meaningful access to the Commission or that the Defendants engaged in sham litigation.

## II. Parker or State Action Doctrine

The Defendants further assert that their actions are shielded from antitrust liability by the state-action or *Parker* doctrine. This doctrine has been construed to exempt both state agencies and private individuals from liability for activities that might otherwise violate federal antitrust law. See, e.g., *Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 56–57, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985). The parties concur, however, that, since the individual members of the Commission have been dismissed from this suit, the state is no longer party to this action.[23] If the *Parker* doctrine is to find any application in the instant circumstances, therefore, it must shield the Defendants as private individuals.

When the *Parker* exemption is invoked by a defendant other than the state, the allegedly anticompetitive activity is subjected to greater scrutiny before state-action immunity will be granted. See *Hoover v. Ronwin*, 466 U.S. 558, 569, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984). In

---

**23.** Even if the individual members of the Commission remained party to this action, they would doubtlessly be entitled to the *Parker* exemption. See *Earles v. State Bd. of Certified Public Accountants of Louisiana*, 139 F.3d 1033, 1041–42 (5th Cir.1998) (noting that individual members of a state certifica-

tion board were entitled to the *Parker* exemption because their actions in adopting and enforcing rules were taken "pursuant to state policy to displace competition with regulation or monopoly public service" that was "clearly articulated and affirmatively expressed").

*California Retail Liquor Dealers Ass'n v. Midcal Aluminum*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the Supreme Court articulated a two-pronged test to determine whether private individuals are entitled to the *Parker* exemption: (1) the alleged anticompetitive conduct must have been taken pursuant to a clearly articulated and affirmatively expressed state policy to displace competition with state regulation; and (2) the state must actively supervise the implementation of its policy. See *id.* at 105, 100 S.Ct. 937; see also *Earles v. State Bd. of Certified Public Accountants of Louisiana*, 139 F.3d 1033, 1040–41 (5th Cir.1998)(applying the *Midcal* test).

■■■ The Defendants claim to have satisfied the *Midcal* criteria because their actions were all taken within the context of the state's regulatory scheme that displaces competition in the market for live horse racing. This construction of the *Midcal* test, however, is a strained one. The state's regulatory scheme may well displace competition in the market for live horse racing, but the Defendants played no role in implementing or enforcing that regime. See *DFW Metro Line Servs., v. Southwestern Bell Tel. Corp.*, 988 F.2d 601, 603 (5th Cir.1993)(holding that a private utility's enforcement of rates set by the state, which it was required to do under the state's regulatory scheme, was protected by *Parker*). Nor were the Defendants' anticompetitive actions "actively supervised" or even endorsed by the state. See *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 633–34, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992). The Defendants herein did nothing more than to urge the government to take anticompetitive action. Therefore, their efforts are shielded, if at all, by the *Noerr–Pennington* doctrine. See *Omni*, 499 U.S. at 379–80, 111 S.Ct. 1344 (noting that *Parker* is the corollary to *Noerr–Pennington* and that it is the latter which exempts from federal antitrust laws "conduct of private individuals in seeking anticompetitive action from the government.").

**Civil RICO Claims**

LDRA also brings claims against the defendants under the civil RICO statutes. It contends that the Defendants' concerted efforts to obstruct its entry into the market for live horse racing and gambling constitute such a violation. The Defendants offer several defenses to this claim, including, *inter alia*, res judicata. Specifically, the Defendants assert that LDRA's RICO claims are all predicated on the same occurrences giving rise to LDRA's 1993 action in state court alleging violations of Louisiana's Unfair and Deceptive Trade Practices Act. The final judgment against LDRA in that case, entered April 27, 1995, the Defendants urge, bars relitigation of these claims under La.Rev.Stat. § 13–4231.

Apparently conceding that some of its claims are res judicata, LDRA argues that the Thomas and Odom lawsuits form the exclusive basis of its RICO action.[24] See Plntff's Opposition to Summary Judgment at 69–70. LDRA asserts that these two claims are not res judicata because they were not known to them at the time it filed the 1993 state-court action. In this regard, LDRA alleges that it did not discov-

---

**24.** This would seem to be a counterfactual assertion. LDRA's RICO case statement identifies four predicate acts that comprise the foundation of its RICO claims. See doc. no. 74. These acts include the Thomas and Odom litigation, but they also include "the actions taken by the Committee to Control Gambling in attempting to persuade citizens of Livingston Parish to vote down the referendum election on live horse racing" and "the actions taken by Bankston before the Louisiana State Racing Commission." See *id.* at 13–14. LDRA unsuccessfully raised the latter two claims in its state-court action under Louisiana's Unfair and Deceptive Trade Practices Act. See Def.'s Exh. O & P.

er that the Defendants were the impetus behind the Thomas and Odom lawsuits until it was able to depose Thomas and Odom in 1997. See *id.* at 70.

■■■ When a defendant in Louisiana prevails in a civil action, § 13:4231 bars a second action between the parties on any cause of action "existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the [prior action]." See La.Rev. Stat. Ann. § 13:4231(2) (West 2001). The Court need not decide whether the Thomas and Odom lawsuits satisfy the "same occurrence or transaction" criterion, however, for § 13:4232 enumerates several exceptions to § 13:4231's broad application of the doctrine of res judicata. Among these exceptions is that a judgment does not bar a successive action by a plaintiff "[w]hen exceptional circumstances justify relief from the res judicata effect of the judgment...." La.Rev.Stat. § 13:4232A(1) (West 2001). The official comment to § 13:4232 explains that this provision gives courts the authority to exercise their equitable discretion to balance the principle of res judicata with the interests of justice.

The Court concludes that the Defendants' alleged use of straw plaintiffs, coupled with the Defendants' successful efforts to delay the depositions of Thomas and Odom, abates the principles of judicial economy and finality that underlie the doctrine of res judicata. See *Tate v. Prewitt*, 33,895 (La.App. 2 Cir. 9/27/00), 769 So.2d 800, 803 (noting that res judicata promotes judicial efficiency and final resolution of disputes). This is certainly not a case in which a plaintiff has simply failed to assert a right or claim through oversight or lack of proper preparation. See La.Rev.Stat. § 13:4232 cmt. (West 2001). Accordingly, the court will exercise its discretion and permit LDRA's claims to proceed.

The Defendants further contend that LDRA lacks standing to bring its RICO

claims because it has failed to allege a concrete injury to its business or property resulting from the Defendants' purported racketeering activities. The losses identified by LDRA thus far, note the Defendants, include expenses in dealing with the Thomas and Odom litigation and lost profits from the inability to enter the market for live horse racing. The Defendants characterize the first category of losses as normal business expenses that are beyond the ambit of RICO. They also assert that the latter type of injury is too speculative to support a RICO claim. Alternatively, the Defendants maintain that LDRA cannot establish that its alleged racketeering activities were the proximate cause of its alleged injuries.

■■■ To establish standing under § 1964(c), a plaintiff must show (1) a violation of § 1962, (2) an injury to his business or property, and (3) that his injury was proximately caused by a RICO violation. See *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *Cullom v. Hibernia Nat'l Bank*, 859 F.2d 1211, 1214 (5th Cir.1988).

■■■ The Court concludes that LDRA has established an injury to its business or property sufficient to confer standing. In *Khurana v. Innovative Health Care Systems, Inc.*, the plaintiff alleged that the defendant had damaged his professional reputation by fraudulently inducing the plaintiff to accept employment with the defendants, who were engaged in a conspiracy to defraud Medicare. See 130 F.3d 143, 150 (5th Cir.1997), vacated on other grounds sub. nom., *Teel v. Khurana*, 525 U.S. 979, 119 S.Ct. 442, 142 L.Ed.2d 397 (1998). The plaintiff also asserted that, in fraudulently inducing him to work for them, the defendants had deprived him of other, legitimate business opportunities. See *id.* The Fifth Circuit concluded that

these injuries were sufficient to confer standing upon the plaintiff.

LDRA asserts that, as a result of the Defendants' maintenance of the Thomas and Odom lawsuits, it was required to expend substantial sums contesting those lawsuits. It further alleges that these lawsuits were the principal barrier to their entry into the market for live horse racing and gambling. These losses are palpable enough to satisfy the "injury to business or property" requirement for RICO standing.

Less clear, however, is whether LDRA can fulfill the other two requirements for RICO standing. Defining the scope of proximate cause for purposes of RICO standing has proven an elusive task. See, e.g., *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (noting that "the infinite variety of claims that may arise [under RICO] make it virtually impossible to announce a black-letter rule [of proximate causation] that will dictate the result in every case."). In *Holmes,* the Supreme Court directed courts to look to "the many shapes this concept took at common law." *Id.* at 268, 112 S.Ct. 1311. The Fifth Circuit has interpreted *Holmes* as holding merely that "common law ideas about proximate causation inform the understanding of RICO." *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 565 n. 53 (5th Cir.2001)(citing *Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250, 1257 (7th Cir.1995)). Accordingly, it has been held that the pertinent inquiry in determining the existence of proximate cause is "whether the conduct has been so significant and important a cause that the defendant should be held responsible." *Chisolm v. TransSo. Fin. Corp.*, 95 F.3d 331, 336 (4th Cir.1996) (quoting Prosser & Keeton on Torts § 42, p. 272 (5th ed.1984)). The proximate cause determination for RICO standing is guided by indications of preconceived purpose,

specifically intended consequence, necessary or natural result, reasonable foreseeability of result, the intervention of independent causes, whether the defendant's acts are a substantial factor in the sequence of responsible causation, and the factual directness of the causal connection. See, e.g., *Chisolm,* 95 F.3d at 338; *In re Am. Express Co. Shareholder Litig.,* 39 F.3d 395, 400 (2d Cir.1994); *Standardbred Owners Ass'n v. Roosevelt Raceway Assocs.,* 985 F.2d 102, 104 (2d Cir.1993).

Applying these principles to the instant case, it would seem clear that the expenses LDRA incurred in fighting the Thomas and Odom suits were a direct and foreseeable consequence of those suits. As LDRA alleges that the Defendants intended to inflict these expenses as part of their conspiracy to exclude LDRA from the market for live horse racing, these injuries satisfy the proximate cause requirement for RICO standing.

Yet as to LDRA's claim that the lawsuits deprived them of future income by preventing them from operating a race track, it would seem that several intervening factors irretrievably shatter the chain of causation. It is true that LDRA was unable to obtain financing until after the Odom suit was dismissed, but it is unclear to what extent that the Odom suit was responsible for this. LDRA has presented affidavits suggesting that the Odom suit was a concern for potential investors, see Plntff's Exh. 13, but it would seem axiomatic that other concerns would also have played a role in these potential investors' decisions not to finance Livingston Downs. Moreover, it is indisputable that LDRA's entry into the market for live horse racing was ultimately foreclosed not by the Odom lawsuit, but rather by the Commission's rejection of LDRA's renewed racing application. The basis for the Commission's rejection of this application was the inadequacy of LDRA's financial backing; it had

nothing to do with the Odom lawsuit. In the end, it was LDRA's own inability to satisfy the criteria of the consent agreement that scuttled its efforts to enter the market for live horse racing.

Because there are too many intervening factors to establish proximate causation as to LDRA's ultimate failure to enter the market for live horse racing, the Court concludes that LDRA lacks standing to pursue a RICO claim on this ground. See *Procter & Gamble*, 242 F.3d at 565. Because LDRA has established a direct harm stemming from the expense of defending the Thomas and Odom lawsuits, however, it does have standing to pursue that claim.

### CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** the Defendants' Motion for Summary Judgment (doc no. 295) insofar as it seeks dismissal, under the *Noerr–Pennington* doctrine, of LDRA's claims that its efforts to influence the Louisiana State Legislature and the Commission were violative of the Sherman Act. The Court, however, **DENIES** the Defendants' Motion for Summary Judgment (doc. no. 295) insofar as it seeks dismissal of LDRA's claims that the Defendants violated the Sherman act through sham petitioning before the Commission and through sham litigation in the state courts. The Court also **GRANTS** the Defendants' Motion for Summary Judgment (doc no. 295) to the extent that it seeks dismissal of LDRA's RICO claim for lost profits but **DENIES** the motion to the extent that it seeks dismissal of LDRA's RICO claim for the expenses incurred as a result of the purportedly sham litigation.

**MOTION GRANTED IN PART, DENIED IN PART.**